**Affirmed in Part, Reversed in Part, and Rendered; and Opinion filed March 21, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00865-CV

---

## IN THE INTEREST OF F.M.E.A.F., A.A.F.H., AND A.J.F.H., CHILDREN

---

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2013-04982J**

---

### OPINION

This case involves the termination of the parental rights of the mother and fathers of three children after the trial court had previously denied termination. Appellant Mother of the children and Appellant Father of the two younger children appeal from the trial court's termination of their parental rights, challenging the sufficiency of the evidence. The father of the oldest child has not appealed.

We reverse the trial court's final order of termination of Mother's parental rights for the oldest child because the evidence is legally insufficient to prove by clear and convincing evidence that termination is in the child's best interest, and

we render judgment that Mother's parental rights for the oldest child are not terminated. We affirm the remainder of the trial court's final order that has been challenged on appeal.

## I.  STANDARDS OF REVIEW

"Termination of parental rights is traumatic, permanent, and irrevocable." *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003). Termination is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination of the parent-child relationship by clear and convincing evidence. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Any significant risk of erroneous termination is unacceptable. *In re M.S.*, 115 S.W.3d at 549. The Supreme Court of Texas "cannot think of a more serious risk of erroneous deprivation of parental rights than when the evidence, though minimally existing, fails to clearly and convincingly establish in favor of [the factfinder's] findings that parental rights should be terminated." *Id.*

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to require clear and convincing evidence. *In re L.G.R.*, 498 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007. This heightened burden of proof results in a heightened standard of review when evaluating the sufficiency of the evidence. *In re L.G.R.*, 498 S.W.3d at 202.

Under a legal sufficiency review, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all

evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but we do not disregard undisputed facts. *Id.*

Under a factual sufficiency review, we also consider disputed and conflicting evidence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

## II. SCOPE OF THE RECORD FOR SUFFICIENCY REVIEW

In several issues, Mother contends that this court's sufficiency review should be confined to certain evidence in the record. Thus, we begin by addressing the scope of the record to be considered in our sufficiency review.

### A. Judicial Notice of the Clerk's Record

In her first issue, Mother contends that the record is limited to the reporter's record because the trial court did not announce explicitly that it would take judicial notice of the clerk's record. Mother acknowledges authority adverse to her position from this court. *See, e.g.*, *In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). She states, "Because this Court has already spoken to this issue, Appellant raises this here to preserve for supreme court review of the due process concerns and split in the courts of appeals." Because we are bound by this court's precedent, we overrule Mother's first issue. *See Taylor v. First Cmty. Credit Union*, 316 S.W.3d 863, 869 (Tex. App.—Houston [14th Dist.] 2010, no pet.). We presume the trial court took judicial notice of the clerk's record. *See In re K.F.*, 402 S.W.3d at 504. But we agree with Mother that no factual statements or

allegations contained in the clerk's record, which were not admitted during the final hearing, may be considered evidence when reviewing the sufficiency of the evidence. *See id.* at 505 (trial court "may not take judicial notice of the *truth* of factual statements and allegations contained in the documents" in the court's files).

## B.    Evidence Predating the Trial Court's Prior Order Denying Termination

In her second issue, Mother contends that when reviewing the sufficiency of the evidence, this court may only consider evidence of "facts and circumstances that have taken place since February 16, 2016, the date that the trial court denied the Department's last request to terminate Mother's parental rights." For example, she contends that this court may not consider Mother's criminal history before February 16, 2016.

### 1.  *Procedural Background*

In September 2013, the Department of Family and Protective Services filed its original petition in a suit affecting the parent-child relationship, seeking to terminate the parents' rights to their children. The trial court held a final hearing in 2015 and ultimately signed a final order on February 16, 2016, denying the Department's request for termination because the Department failed to prove that termination was in the children's best interest. The trial court designated the Department as the children's sole managing conservator while retaining limited possessory conservatorships for the parents.

In November 2017, the Department filed a motion to modify the final order, again seeking termination of the parent's rights. The final hearing on the motion to modify and for termination occurred in August 2018. Mother objected to the trial court's admission of her judgments of convictions that predated the original final hearing in 2015, and the court overruled her objections.

4

## 2. Legal Principles

When, as here, the Department seeks termination after a trial court's prior denial of termination, the trial court may terminate parental rights by following the familiar procedure under Section 161.001 of the Family Code, or the court may terminate parental rights under Section 161.004. *See In re A.L.H.*, 515 S.W.3d 60, 89 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Section 161.001 provides the typical avenue for termination, when a court may terminate based on findings that (1) the parent committed one or more acts specifically named in the Family Code as grounds for termination, and (2) termination is in the child's best interest. *See In re U.P.*, 105 S.W.3d 222, 229 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Section 161.004 provides an alternative method for termination following the rendition of an order that previously denied termination if (1) termination is in the child's best interest, (2) the new petition to terminate was filed after the date of the prior order denying termination; (3) the parent committed an act listed under Section 161.001 before the date of the prior order denying termination; and (4) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order have materially and substantially changed since the date of the order. Tex. Fam. Code § 161.004(a). At a hearing under this section, "the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child." Tex. Fam. Code § 161.004(b).

## 3. Scope of Record for Sufficiency Analysis Includes Evidence Predating Prior Order

In this case, the Department asked for termination based on both Sections 161.001 and 161.004, and the trial court made findings related to both statutes. It is clear from the arguments presented to the trial court and on appeal that the

Department was relying on Mother's conduct occurring both before and after the February 16, 2016 order denying termination. Mother contends that the Department "can't have it both ways" and rely on evidence from both before and after the order.

We disagree with Mother's contention. Section 161.004 does not state that the trial court may not rely on evidence of acts listed in Section 161.001 occurring both before and after the prior order of termination. Nor does Section 161.004 state that the trial court's best interest analysis is limited to evaluating evidence of facts and circumstances occurring after the trial court's prior order. On the contrary, the statute allows the trial court to consider evidence presented at a previous hearing. *See* Tex. Fam Code § 161.004(b).

The Fort Worth Court of Appeals evaluated the text of the statute, its history, and public policy to address the question of whether Section 161.004 was the "exclusive means to terminate a parent's rights after denial of a prior termination or just a means to admit evidence from a prior termination trial." *In re K.G.*, 350 S.W.3d 338, 345–52 (Tex. App.—Fort Worth 2012, pet. denied). The court reasoned that the statute was a means to admit evidence from a prior termination hearing, and the court held that the trial court erred by admitting such evidence because the Department did not plead Section 161.004 as a ground for termination. *See id.* at 352. This court similarly held in *In re A.L.H.* that Section 161.004 provides only one of several avenues for termination of parental rights. *See* 515 S.W.3d at 89. Accordingly, Mother's second issue is overruled. In evaluating the sufficiency of the evidence regarding the best interests of the children and regarding Mother's conduct in violation of Section 161.001, we will consider evidence presented before and after the trial court signed is prior order denying termination.

6

### 4. *Sufficient Evidence of Material and Substantial Change*

In her eighth issue, Mother contends that there is legally and factually insufficient evidence of a material and substantial change. Mother does not request any specific relief under this issue, cite to any legal authority, or analyze the evidence under any particular standard of review. Accordingly, it is unclear whether Mother's eighth issue directly attacks the final order or is intended to affect the scope of review of her other sufficiency points. *See In re D.N.*, 405 S.W.3d 863, 870 (Tex. App.—Amarillo 2013, no pet.) ("[T]o rely on acts or omissions evidence of which has been presented to the trial court prior to the earlier order denying termination, the Department must garner sufficient evidence of section 161.004's elements, including a material and substantial change of the parties' circumstances."). We assume without deciding that the Department was required to prove a material and substantial change to rely on evidence of acts or omissions occurring before the trial court's prior order. *See id.* at 869–70. Because we ultimately consider evidence of acts and omissions occurring before the date of the trial court's prior order when evaluating the sufficiency of the evidence to prove the children's best interest and the predicate ground for termination, we will review the sufficiency of the evidence to support the trial court's finding of a material and substantial change in circumstances.

"[T]here are no definite guidelines as to what constitutes a 'material and substantial change in circumstances' to terminate parental rights under section 161.004." *In re A.L.H.*, 515 S.W.3d at 89. By way of example, this court has determined that a material and substantial change existed when the parent was adjudicated guilty of a crime and sentenced to prison after the prior order, *see In re C.A.C.*, No. 14-12-00396-CV, 2012 WL 4465234, at *9 (Tex. App.—Houston [14th Dist.] Sept. 27, 2012, no pet.) (mem. op.), and when a parent failed to

complete a family service plan by failing to visit the child and attend medical appointments, *see In re M.J.W.*, No. 14-16-00276-CV, 2016 WL 4206046, at *8 (Tex. App.—Houston [14th Dist.] Aug. 9, 2016, pet. denied) (mem. op.).

It is undisputed in this case that Mother signed a family service plan directing her to refrain from criminal activity, and she subsequently committed a state jail felony theft for which she was placed on community supervision. Then she pleaded guilty to another state jail felony theft, and her community supervision was revoked. In each case, she was sentenced to 180 days in state jail to run concurrently. She was incarcerated at the time of the final hearing. When she was arrested, she failed to attend a supervised meeting with her children or provide advanced notice of her absence as required by the family service plan.

Mother's failures to comply with the family service plan and her incarceration for state jail felonies support the trial court's finding by clear and convincing evidence that there was a material and substantial change under Section 161.004. *See id.*; *In re C.A.C.*, 2012 WL 4465234, at *9–10.

Mother's eighth issue is overruled.

### III. BEST INTEREST OF THE CHILDREN

Under both avenues for termination pleaded by the Department and found by the trial court in this case, the Department had the burden to prove by clear and convincing evidence that termination was in each child's best interest. *See* Tex. Fam. Code §§ 161.001(b)(2), 161.004(a)(4). In her third issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding for each of the three children. In his sole issue on appeal, Father challenges the factual sufficiency of the evidence to support the trial court's best-interest finding for the two younger children.

8

## A.    Legal Principles

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re B.J.C.*, 495 S.W.3d 29, 35 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

In assessing whether the evidence is sufficient to prove that termination is in the best interest of a child, we may consider the non-exclusive factors discussed in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (1976). *See In re E.C.R.*, 402 S.W.3d 239, 249 & n.9 (Tex. 2013). These factors include (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* (citing *Holley*, 544 S.W.2d at 371–72). We also consider the statutory factors in Section 263.307 of the Family Code, including the child's age and vulnerabilities. *See In re A.R.M.*, No 14-13-01039-CV, 2014 WL 1390285, at *9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (citing Tex. Fam. Code § 263.307(b)).

The best-interest analysis is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A child's need for permanence through the establishment of a stable, permanent

home is the paramount consideration in a best-interest determination. *In re B.J.C.*, 495 S.W.3d at 39.

## B.    Evidence

At the time of the final hearing in August 2018, Mother had three children, and the two younger children were also Father's. The oldest child, F.M.E.A.F (Fanny), was sixteen at the time of the final hearing. The two younger children, A.A.F.H. (Abigail) and A.J.F.H. (Adam), were ten and seven respectively.[1]

### 1. Mother

Mother is bipolar and has a history of not being properly medicated. When she is not properly medicated, she is unstable. In July 2013, Mother had a "mental breakdown" following the death of her twin babies shortly after their births. While Mother was visiting in Dallas, she threatened suicide in her children's presence by breaking a pair of sunglasses and threatening to slit her wrists. Mother was held in a psychiatric hospital for a week and a half while the Department took emergency custody of the children.

Mother has an extensive criminal history for thefts, trespassing, and resisting arrest, as reflected by judgments of convictions admitted at the final hearing:

---

[1] We use fictitious names for the minors. *See* Tex. R. App. P. 9.8.

| Offense | Offense Date | Conviction Date | Sentence |
|---|---|---|---|
| Theft <$2,500 2/more prev convs | 3/8/2018 | 7/17/2018 | 180 days TDCJ state jail |
| Trespass Prop/Bldg-No Depart | 11/17/2016 | 2/8/2017 | 2 days jail |
| Theft <$2,500 2/more prev conv | 9/12/2016 | 7/17/2018 | 180 days TDCJ state jail |
| Trespass Prop/Bldg – No Depart | 2/14/2015 | 2/16/2015 | 6 days jail |
| Theft Under $1500 – 3rd Offense | 7/5/2014 | 2/17/2015 | 1 year TDCJ state jail |
| Resisting Arrest/Search | 2/8/2013 | 2/15/2013 | 30 days jail |
| Theft Under $1500 – 3rd Offense | 9/26/2011 | 5/17/2012 | 8 months state jail |
| Evading Arrest/ Detention | 4/7/2010 | 4/14/2010 | 14 days jail |
| Theft $50 to $500 | 12/5/2005 | 12/08/2005 | 30 days jail |
| Resisting Arrest | 4/7/2005 | 4/15/2005 | 20 days jail |
| Resisting Arrest | 6/1/2000 | 6/9/2000 | 30 days jail |
| Theft $50 to $500 | 1/12/2000 | 6/9/2000 | 30 days jail |

Mother testified that she had been convicted of other thefts not reflected in this table. At the time of the final hearing in August 2018, Mother was incarcerated for two state jail felony theft cases. She anticipated being released in November 2018.

After the trial court denied the Department's initial request to terminate parent-child relationships in 2015, the Department gave Mother a new family service plan. The Department described its permanency goals for each child as "relative/fictive kin adoption." The service plan explained that relative/fictive kin adoption would require termination of the parents' rights.

The Department's caseworker, who had been on the case for about a year by the time of the final hearing, testified about Mother's compliance and noncompliance with the service plan. The caseworker testified that Mother had complied with the service plan requirements of completing parenting classes, a psychological exam, the "Been There Done That" program, an anti-theft course,

and random drug testing. Mother did not test positive for any drugs and does not have a problem with substance abuse.

The caseworker testified that Mother did not comply with her service plan because she failed to refrain from engaging in illegal activity. The caseworker testified that Mother was not compliant with the psychiatric treatment required by the service plan. However, the caseworker admitted that Mother had received some psychiatric treatment. The caseworker received a letter in August 2017 showing that Mother was compliant with her psychiatric treatment. The caseworker believed the Department should have received "something monthly saying that Mom is complying with all her psychiatric recommendations and treatment." The service plan, however, does not require Mother to send "something monthly" to the Department. Rather, the service plan required Mother to "provide the [Department] worker with a release of information for all service providers, medical personnel, and officers of the court to obtain records and progress information regarding her case." Mother testified that she did not know she was supposed to provide the caseworker with a letter every time she went to the doctor.

The caseworker also testified that the service plan required mother to comply with her medications and make the Department aware of compliance. Indeed, the service plan required Mother to "remain in compliance with her medications and provide a list of her medications to the worker." The caseworker testified that the most recent information regarding Mother's current medications was the August 2017 letter.

Mother testified that she remained in compliance with her medications. She testified that she was seeing a psychiatrist and was medicated with a mood stabilizer, a pill for anxiety, a pill for seizures, and Prozac for depression. She

testified that she was "stable" for a year on medications, but she was not stable at the time of the final hearing.

The caseworker testified that before mother was arrested for her current charge, Mother had been "pretty consistent" maintaining contact with the Department and attending her visits with the children twice per month. Mother would always answer her phone and take random drug tests. But Mother had not always been on time for her visits. When Mother did not show up to a scheduled visit as a result of her recent arrest, the caseworker knew "something was wrong."

The caseworker testified that Mother did not display any mental health illness or disability during the supervised visits. Nothing occurred during the visits that indicated to the caseworker that Mother was not compliant with her mental health. According to one of the Department's permanency reports, however, Mother had an unsupervised weekend visit in 2015 during which Mother took the children to a store and "had them stealing items with her."

Mother brought a lot of things for the children to the visits. She would bring clothes, shoes, and things they needed for school. But the caseworker testified that Mother's child support payments have "not been consistent."

Mother also testified that the children were healthy before the Department took custody of them. She testified that she had been able to provide them with a home, clothing, and food before the Department took them. According to the family service plan, Mother had ensured that the children attended school daily before the Department took custody. The family service plan also stated that Mother had familial support and community support in the form of Medicaid, SNAP, and SSI.

Mother testified that she provided the Department with proof of a stable home environment before she was arrested, but she could not provide any stable housing for the children at the time of the final hearing. She testified that when she is released from jail, she will be able to go back to work at a Whataburger restaurant. She testified that she had a husband and would have a home.

## 2. *Father*

Father has an extensive criminal history, and his offenses primarily include drugs and assaults:

| Offense | Offense Date | Conviction Date | Sentence |
|---|---|---|---|
| Possession With Intent to Deliver Controlled Substance | 7/29/2015 | 10/18/2016 | 2 years institutional division TDCJ |
| Assault – Bodily Injury | 3/12/2016 | 4/8/2016 | 13 days jail |
| Assault – Family Member | 3/12/2014 | 10/29/2014 | 120 days jail |
| Possession of Controlled Substance | 5/2/2012 | 5/7/2012 | 20 days jail |
| Possession of Marijuana | 2/6/2012 | 2/9/2012 | 8 days jail |
| Possession of Cocaine | 10/2/2010 | 12/9/2010 | 7 months state jail |
| Resisting Arrest | 7/26/2010 | 7/30/2010 | 30 days jail |
| Resisting Arrest | 2/16/2010 | 2/19/2010 | 8 days jail |
| Violation of Protective Order | 1/29/2009 | 5/19/2009 | 1 year jail |
| Assault – Family Member | 11/23/2008 | 12/31/2008 – Convicted 5/20/2009 – Probation Revoked | 100 days jail |
| Possession of Marijuana | 11/24/2007 | 1/28/2008 | 4 days jail |

Mother was the complainant for the May 2009 convictions for assault and violation of a protective order. And, Father violated the protective order by assaulting Mother. He had a "history of PCP use" according to the Department's records.

Father received a family service plan, but according to the caseworker, he did not complete any of the requirements. Specifically, he did not complete any parenting classes, a substance abuse assessment, or a psychosocial evaluation. He did not submit to any random drug tests, and he did not pay child support. And of course, he did not refrain from criminal activity.

According to the caseworker, since Father was released from prison in the fall of 2017, he had visited Abigail and Adam maybe two or three times until May 2018. By the time of the final hearing, he was visiting about twice per month. His last visit was in June 2018. He was not always on time. While Mother was in jail, Father would let the children talk to her on the phone during his visits. The caseworker described his visits with the children as "appropriate."

Father testified that at the time of the final hearing he was living in a one-bedroom apartment with his mother, and his housing situation would not allow for the children to live with him. He agreed that he could not take care of the children and provide them with a good home at the time of the final hearing.

Father testified that he was working as a server at Sweetie Pies restaurant and making $2.15 an hour. He testified that the Department had "filed" against him to get child support out of his paycheck, but nothing had been taken out. He had not paid any child support for Abigail and Adam since he was released from prison in the fall of 2017. He testified that he has a total of ten children, most of whom were minors at the time of the final hearing. He was not paying child support to the Attorney General's Office for any of them.

When asked about what his plans were for his children, he testified he would like Abigail "to be a great woman" and for Adam to be President. Father wanted Abigail to live with Father's sister or his mother's cousin (hereafter, Cousin). Father wanted his son to live with Father.

### 3. *The Children*

The Department's records describe sixteen-year-old Fanny as a bright, beautiful, and well-mannered girl with a big heart. She ran track for school and made As and Bs. She plans to go to college. She was, however, always worried about her younger siblings because she felt like a parent to them.

The Department's records describe ten-year-old Abigail as a high-strung child who is very active. She struggled academically and "continues to have severe behavioral problems in the foster home, which includes temper tantrums, mood swings, disruptive and defiant behaviors, and stealing." Abigail reported that she "enjoys stealing because her mother steals and the police will not take children to jail."

While in the Department's custody, Abigail's "behavior has increase[d,] and she is now showing sign [sic] of sexually inappropriate behaviors." She was "hospitalized for inappropriate sexual behavior and for attempting to physically harm her foster dad by kicking and hitting him." By the time of the final hearing, Abigail was on medications for ADHD, a mood disorder, and insomnia.

The Department's records describe seven-year-old Adam as doing well in school, but he has "begun to have slight behaviors which includes not listening and having crying spells and temper tantrums." He displayed aggression toward his foster parents, and he did not like to follow directions. He "has high expectations that he will return home, and states his behavior is because []he will not be in the foster home for long." Adam was on medications for ADHD, anxiety, and aggression.

The caseworker testified that the children understand they might not live physically with Mother, but they still want to see her. They look forward to her

visits. They love her. The children are happy to see their father at visits, and they love him. The children get "very disappointed and upset" when their parents do not attend visits and when the children are not able to communicate with their parents. Fanny has also felt humiliated and embarrassed by the actions of her parents. Abigail and Adam knew that Mother was in jail by the time of the final hearing.

The caseworker testified that Fanny wants a mother and does not want to be adopted. The only complaint that the caseworker knew about Fanny from a foster parent related to a time Fanny possessed a cell phone and would make unsupervised phone calls back and forth with Mother. Fanny was calling Mother because Fanny wanted to talk to Mother. By the time of the final hearing, Fanny was aware of Mother's mental health disability.

The caseworker was not sure she could answer whether Fanny wanted a father. There is no evidence about whether Abigail and Adam want to live with their parents because the trial court sustained the Department's objection when Mother's attorney cross-examined the caseworker. The caseworker testified that she had not talked with the younger children about the difference between adoption and conservatorship.

### 4. Placements

Up until the final hearing, the children had been living together in foster care. On the second day of the final hearing, however, Fanny moved into a relative's home without her siblings. Quite a few families had asked to adopt Fanny, but she did not want to be adopted. The Department's primary goal for Fanny is "independent living" so Fanny will "age out of the system."

The caseworker testified that parental rights did not need to be terminated for Fanny to go through independent living courses. When asked whether Mother's

rights could be kept intact and Fanny still age out appropriately, the caseworker testified, "Yes, she could."

The caseworker testified that if Mother's rights were not terminated for Fanny, the relative could still provide a safe environment for Fanny. The relative, however, did not have a good history with Mother. The relative had "backed away" from being considered for placement earlier because the relative was concerned about Mother's mental well-being and lifestyle choices.

The Department's goal for the younger children was adoption. The Department had "broadcast" the younger children for adoption twice—in 2016 and 2017. There were "no hits," which meant that the Department could not find an adoptive family for the younger children. The Department had not had any luck finding a foster parent who wanted to adopt or keep the younger children long term. The younger children have lived in at least four different foster homes over the past five years. Their most recent foster home placement lasted about fifteen months. According to the caseworker, the younger children were getting all of their needs met in foster care.

The caseworker also testified regarding fifteen relatives considered by the Department for the children's placement. According to the caseworker, none of them were appropriate. The relative with whom Fanny was placed did not want the younger children due to the relative's work schedule. For the other relatives, either the individuals did not want the children, they were denied by the Department, or there was a lack of follow-up.

Like the relative who ultimately agreed to take Fanny, at least one of these other relatives did not want to be considered for placement because they "did not want to deal with" Mother. The caseworker testified that she had concerns about placing the younger children with relatives if the Mother's rights were not

terminated. Placements with relatives had not worked out in the past because of Mother's behaviors—specifically, "Not being on her meds and fighting with relatives." The caseworker believed that the Department would have a better chance at finding a successful relative placement for the younger children if Mother's parental rights were terminated.

Cousin was a potential relative placement whom the Department was still considering at the time of the final hearing. Cousin testified that she was a former foster parent for fifteen to twenty years, and she was willing to take all three children. She was not interested in adopting the children because she was seventy-six years old. She would have had no problems if the parents' rights were not terminated and they were allowed to visit with the children.[2]

## C.  Legally Insufficient Evidence that Termination of Mother's Parental Rights is in Fanny's Best Interest

Considering all of the evidence discussed above, a reasonable factfinder could not have formed a firm belief or conviction that termination of Mother's parental rights is in Fanny's best interest.

The desire of a child is only one factor to consider, but the factor weighs against termination when evidence of the parent's failures is not overwhelming. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 245 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A child's love for a parent cannot be ignored as a reflection of the parent's ability to provide for the child's emotional needs. *Id.* A child's love for their parent is "a very important consideration in determining the best interest of the children," although it cannot override or outweigh evidence of danger to the child. *In re K.L.P.*, No. 14-18-00582-CV, 2018 WL 6684275, at *10

---

[2] At the conclusion of the final hearing, the court ordered the Department to conduct a home study on Cousin within thirty days.

(Tex. App.—Houston [14th Dist.] Dec. 20, 2018, pet. denied) (mem. op.) (affirming termination despite grade-school-aged and younger children's love for their mother because the mother failed to protect the children from the father's physical abuse).

Here, more than merely express love for her Mother, a well-adjusted sixteen-year-old child expressed her desire to have a mother and not to be adopted by anyone. The only rational view of this evidence is that Fanny did not want Mother's parental rights terminated.

The Department respected Fanny's wishes regarding adoption, changing the Department's goal for Fanny from "relative/fictive kin adoption" to "independent living" with the plan for Fanny to "age out" of the system. This evidence demonstrates that Fanny was sufficiently mature for her wishes to be afforded respect. *See Yonko*, 196 S.W.3d at 245 (nine-year-old's desire to remain with mother weighed against a finding that termination was in child's best interest); *cf. In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (discounting the desires of children ages five through nine because "there was no indication that any of the children were sufficiently mature to express a preference as to their placement").

As the caseworker acknowledged, the Department's goal for Fanny to transition to independent living by aging out of the system could be met even if the trial court did not order termination. Although the relative with whom Fanny had been placed initially expressed concern about Mother's conduct and mental illness, the caseworker testified that the relative could still provide a safe environment for Fanny regardless of whether Mother's rights were terminated.

"Evidence about placement plans and adoption are, of course, relevant to best interest." *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). The Supreme Court of

20

Texas has cautioned that a "lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor" because if so, terminations would regularly be subject to reversal on the sole ground that "an adoptive family has yet to be located." *Id.* Regarding Fanny, this record contains not a mere lack of evidence regarding definitive plans for adoption, but undisputed evidence that there are no plans for adoption now or in the future. Thus, there is no evidence that termination would further the need for permanence through the establishment of a stable, permanent home.

Undoubtedly, Mother's repeated violations of the law and imprisonment weigh in favor of a finding that termination is in the best interest of a child. *See, e.g.*, *Yonko*, 196 S.W.3d at 246 (reasoning that a parent's incarceration threatened the child's needs). Mother's conduct has caused Mother's absence from Fanny's life and caused Fanny disappointment, embarrassment, and humiliation.

But incarceration alone is not a sufficient basis for termination of parental rights. *Id.* (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Termination of parental rights should not become an additional punishment for imprisonment for any crime." *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see also In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012) (rejecting proposition that any offense committed by a parent that could lead to imprisonment or confinement would establish endangerment to children). In considering the acts and omissions of a parent leading to the parent's incarceration, we consider the expected length of imprisonment and whether it can be inferred from the criminal conduct that the parent has endangered the safety of the children. *See In re C.T.E.*, 95 S.W.3d at 466.

In *In re C.T.E.*, for example, the First Court of Appeals held that the evidence was insufficient to prove that termination was in the children's best interest when the father's criminal conduct of theft was "not the type from which it can be inferred that he has endangered the safety of his children." *Id.*[3] The court reached this conclusion despite the fact that the father engaged in criminal conduct after signing his family service plan, *see id.* at 466–67, and the fact that the father had prior convictions for possession of cocaine, burglary of a habitation, and assault against the children's mother, *see id.* at 464. The father was expected to be released from prison ten months after the final hearing. *Id.* at 466.

Here, Mother's theft, trespass, and resisting arrest convictions are not the type from which it can be inferred that she has endangered Fanny's physical safety. *See id.* at 466 (theft); *In re D.T.*, 34 S.W.3d 625, 639 (Tex. App.—Fort Worth 2000, pet. denied) (writing hot checks); *see also Yonko*, 196 S.W.3d at 244–49 (factually insufficient evidence although parent participated in aggravated assault and violated community supervision). Mother was expected to be released from jail only a few months after the final hearing. *See In re C.T.E.*, 95 S.W.3d at 466 (ten months, insufficient evidence of best interest).

Mother's criminal endeavors, including at least once perpetrated with the assistance of her children, certainly indicate that the parent-child relationship may be improper. But unlike most decisions upholding termination based on repeated

---

[3] Although the court reversed for *factual* insufficiency, the decision was issued at a time when the court followed "the usual standard in reviewing the legal sufficiency of the evidence." *In re C.T.E.*, 95 S.W.3d at 465. After the decision, however, the Supreme Court of Texas clarified that the usual standard for legal sufficiency does not apply to a parental termination case because the burden of proof is clear and convincing evidence. *See In re J.F.C.*, 96 S.W.3d 256, 264–65 (Tex. 2002). Like the current standard for determining legal sufficiency in a parental termination case, the First Court of Appeals in *In re C.T.E.* held that the factfinder "could not have reasonably formed a firm belief" that termination was in the children's best interest. *In re C.T.E.*, 95 S.W.3d at 469.

criminal conduct, there is no evidence that Mother has perpetrated violence in the home or has a substance abuse problem. *See, e.g.*, *In re D.T.*, 34 S.W.3d at 636 (collecting cases involving sexual and physical abuse and drugs; "In the cases we have found involving termination of parental rights of imprisoned parents, endangerment to a child could easily have been inferred from the underlying conduct of the parent."); *cf., e.g.*, *In re A.R.M.*, No 14-13-01039-CV, 2014 WL 1390285, at *8–11 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (affirming parental termination in part based on parent's frequent incarcerations for drug-related offenses and use of drugs).

The caseworker testified that Mother does not have a substance abuse problem. And, there is no evidence that Mother has been violent toward the children. There is undisputed evidence that, prior to the Department taking custody of the children, Mother provided them with a home, clothing, food, education, and stability. The Department adduced evidence that Mother had community and familial support.

Regarding the excuse for Mother's actions, the Department adduced evidence that Mother suffers from bipolar disorder and has not been adequately medicated. Although there is undisputed evidence that Mother has not been consistently medicated, Mother gave undisputed testimony that she was in therapy and on a variety of medications at the time of the final hearing, but the medications were not adequately stabilizing her mental health disability. In the twice-monthly visits with the children, Mother never displayed any signs of her mental health disability. Fanny, well-aware of Mother's mental health disability, nonetheless desires to retain her relationship with Mother.

None of the remaining *Holley* factors weigh significantly on Fanny's best interest. For example, there is no evidence that Fanny has any specialized emotional or physical needs that would be served by termination.

Considering the evidence in the entire record, with due regard to the factfinder's role as the judge of the credibility of the witnesses, no reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights is in Fanny's best interest.

Mother's third issue is sustained in part.

**D.     Legally and Factually Sufficient Evidence that Termination of Mother's Parental Rights is in Abigail's and Adam's Best Interest**

Several factors lead us to reach an opposite conclusion regarding the sufficiency of the evidence to support the trial court's finding that termination of Mother's parental rights is in Abigail's and Adam's best interest.

First, although there is evidence that the two younger children love Mother, there is no evidence regarding whether the children desire termination of the parent-child relationship or to be adopted. The caseworker did not speak with the younger children about the difference between conservatorship and adoption.

Second, the Department has established a goal for the children to be adopted. The caseworker opined that the Department would have a better chance at finding a successful relative placement for the younger children if Mother's parental rights were terminated, and the caseworker provided examples of relatives who had declined to take the children due to Mother's involvement. This evidence strongly favors the trial court's finding that termination is in the younger children's best interest because of the paramount goal of establishing a permanent, stable home for the children.

The Department has not had much success with finding adoptive parents for the children, however, and the children have lived in at least four foster homes over the course of five years, which weighs against a finding that termination is the children's best interest. *See In re C.T.E.*, 95 S.W.3d at 467–68. Moreover, while in the Department's care, Abigail has begun "showing sign of sexually inappropriate behaviors," for which she had to be "hospitalized." This undisputed evidence weighs against a finding that termination is in the children's best interest. *See id.* at 467–69 (insufficient evidence to support best interest finding when child lived in six foster homes in five years, siblings had been separated, child had been sexually abused while in the Department's care, parent's conviction for theft did not show endangerment, and there was no evidence of parent's dealing drugs since child's birth).

Despite this lack of permanency in foster care, the caseworker testified that the younger children were getting all of their needs met in foster care. Mother, on the other hand, was incarcerated and not stable on her mental health medications. She could not provide a stable and permanent home for the children. This evidence favors the trial court's finding.

Third, Abigail and Adam are younger and have more specialized needs, and the risk for emotional danger is greater compared to Fanny. Both children have displayed aggression toward their foster parents, and both were taking medications for mental health. Mother's conduct and influence has contributed to these specialized needs and emotional endangerment. For example, Abigail reported that she steals because Mother steals. And Adam displays aggression toward his foster parents because he expects to return home and does not expect to live in foster care much longer, despite the fact that the children have been under the Department's

25

custody for five years in part because of Mother's repeated criminal conduct. This evidence favors the trial court's finding.

Considering the evidence in the entire record, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in Abigail's and Adam's best interest.

Mother's third issue is overruled in part.

**E.      Factually Sufficient Evidence that Termination of Father's Parental Rights is in Abigail's and Adam's Best Interest**

Father's criminal history is of a different character compared to Mother's. He has committed numerous drug-related and assaultive offenses, including against Mother. Thus, his criminal history and the continuation of this lifestyle since the Department took custody of the children weighs in favor of the trial court's finding that termination is in Abigail's and Adam's best interest.

Furthermore, Father had not completed any of the services in the family service plan, and he was not compliant with substance abuse testing. He had a history of using PCP. He did not regularly see the children at supervised visits until the summer before the final hearing, even when he was not in prison. There is little evidence that Father provided emotional or physical support for the children before or since the Department took custody. He did not provide any monetary support. It was undisputed at the time of the final hearing that he could not support either of his children since he lived in a one-bedroom apartment with his mother.

Considering the entire record, a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in Abigail's and Adam's best interest. *See, e.g.*, *In re C.A.B.*, 289 S.W.3d 874, 884–89 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (sufficient evidence of endangerment and best-interest finding for parents with criminal lifestyle involving

26

drugs, inconsistent visitation with child, failure to substantially complete family service plan, refusal to complete drug testing, and inability to provide stable home environment).

Father's sole issue is overruled.

## IV.   PREDICATE GROUND FOR TERMINATION

In her fourth through seventh issues on appeal, Mother challenges the sufficiency of the evidence to support the trial court's findings of the three predicate grounds for termination under subsections (E), (F), and (O). *See* Tex. Fam. Code § 161.001(b)(1)(E), (F), (O).

Only one predicate finding under Section 161.001(b) is necessary to support a final order of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). If we find that there is sufficient evidence to support one of the predicate findings, we need not address the sufficiency of the evidence related to the other predicate findings. *In re E.A.K.*, 192 S.W.3d 133, 151 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Mother asks this court to address subsection (E) because of potential collateral consequences related to the finding, unlike the findings under subsection (F) and (O). *See In re C.M.-L.G.*, No 14-16-00921-CV, 2017 WL 1719133, at *8 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) (mem. op.). Without conceding that such review is always necessary, we nonetheless will review the sufficiency of the evidence to support the trial court's finding under subsection (E). *See id.* at *8 & n.6.

Under subsection (E), a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct which endangers the physical or emotional well-being of the

27

child. Tex. Fam Code § 161.001(b)(1)(E). The term "endanger" means the child was exposed to loss or injury or jeopardized. *In re C.A.B.*, 289 S.W.3d at 882 (citing *Tex. Dep't of Human Servs v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Endangerment encompasses more than a threat of metaphysical injury or possible ill effects of a less-than-ideal environment. *Id.* (citing *Boyd*, 727 S.W.2d at 533). The statute does not require that conduct be directed at a child or cause actual harm; rather, it is sufficient if the conduct endangers the emotional well-being of the child. *Id.* at 883.

Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re F.E.N.*, 542 S.W.3d 752, 763 (Tex. App.—Houston [14th Dist.] 2018, pet. filed). In determining whether there is a sufficient course of conduct, a court may consider the parent's actions and inactions occurring both before and after a child's birth, and before and after the child was removed from the parent's home. *Id.* at 763–64.

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Id.* at 764. Mere imprisonment, standing alone, does not constitute engaging in conduct which endangers the emotional or physical well-being of a child. *Boyd*, 727 S.W.2d at 533. But evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment. *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents like appellant repeatedly commit criminal acts that subject them to

the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being.").

In this case, Mother admits on appeal that she has a "theft addiction." Mother's criminal history shows multiple convictions for resisting or evading arrest, trespass, and theft spanning a significant time period. Even after the Department took custody of the children, Mother continued to violate the law and subject herself to imprisonment. And, there is evidence that Mother used her children to steal items from a store while on an unsupervised weekend visit with them in 2015—after the Department had taken custody of the children.

During Mother's recent incarceration, Abigail and Adam knew Mother was in jail. The caseworker testified that the children were very disappointed and upset because Mother was not attending visits with the children. Mother's jeopardizing the children's emotional well-being is evidenced by Abigail's statement that she likes to steal because Mother steals. Thus, Mother's continued criminal activities, along with her imprisonment for six months on her recent theft case, supports the trial court's finding that she engaged in a course of criminal conduct that endangered the emotional well-being of Abigail and Adam. *See In re C.A.B.*, 289 S.W.3d at 887.

Furthermore, the Department adduced evidence that Mother has not been taking medications consistently for her bipolar disorder. When Mother does not take her medications, she is unstable and has been suicidal. "[W]hen a parent's mental state allows her to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of termination the parent's rights." *In re K.L.P.*, No. 14-18-00582-CV, 2018 WL 6684275, at *8 (Tex. App.—Houston [14th Dist.] Dec. 20, 2018, pet. denied) (mem. op.) (quotation omitted) (upholding termination based on subsection (E);

29

considering, among other things, the parent's failure to take medications for schizophrenia, "thus subjecting the children to unpredictable behavior").

Based on this evidence, the trial court could have found that Mother engaged in a voluntary, deliberate, and conscious course of conduct that jeopardized Abigail's and Adam's emotional well-being. A reasonable factfinder could have formed a firm belief or conviction that Mother violated Section 161.001(b)(1)(E), and the disputed evidence is not so significant that a factfinder could not reasonably have formed a firm belief or conviction.

Mother's seventh issue is overruled.

## V.    CONCLUSION

Having sustained Mother's challenge to the legal sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship is in Fanny's best interest, we reverse the portions of the final order terminating Mother's parental rights to Fanny, and we render judgment denying the Department's request to terminate Mother's parental rights to Fanny.

We affirm the remainder of the final order that has been challenged on appeal.[4]


/s/    Ken Wise
Justice


Panel consists of Justices Wise, Zimmerer, and Spain.

---

[4] Mother does not challenge the trial court's appointment of the Department as Fanny's sole managing conservator, so we do not reach that separate issue. *See In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007).