**Affirmed and Majority and Concurring Memorandum Opinions filed March 7, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00652-CV

## IN THE INTEREST OF A.H., L.H., AND A.H., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-01531J**

### MAJORITY  MEMORANDUM OPINION

The trial court terminated both parents' rights to three children.  Mother appeals, contending that the evidence is legally and factually insufficient to support the trial court's findings in support of the judgment terminating her parental rights and appointing the Department of Family and Protective Services as the sole managing conservator of the children.[1]  We affirm.

---

[1] Father did not appeal.

# I. STANDARDS OF REVIEW

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *See In re N.G.*, 577 S.W.3d 230, 230 (Tex. 2019); *In re L.C.L.*, 599 S.W.3d 79, 83 (Tex. App.—Houston [14th Dist.] 2020) (en banc), *pet denied*, 629 S.W.3d 909 (Tex. 2021); *see also* Tex. Fam. Code § 161.001(b).

Termination of the parent-child relationship is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination by clear and convincing evidence. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see also In re L.G.R.*, 498 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007. This heightened burden of proof results in a heightened standard of review when evaluating the sufficiency of the evidence. *In re L.G.R.*, 498 S.W.3d at 202.

Under a legal sufficiency review, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but we do not disregard undisputed facts. *Id.*

Evidence is factually insufficient if, in light of the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a

2

firm belief or conviction." *Id.* We assume that the factfinder resolved disputed evidence in favor of its findings if a reasonable factfinder could do so, but we do not disregard disputed evidence. *See In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020).

## II.   BACKGROUND

The Department petitioned for termination and obtained temporary managing conservatorship of the children in 2020. The final hearing in this case was held over the course of four days between January and July 2022. By the time of trial, the children—Andy, Leyla, and Alex—were about 12, 8, and 4 years of age, respectively.[2]

### A.   Prior Involvement with the Department

The trial court admitted into evidence the removal affidavit, which describes the parents' prior involvement with the Department regarding two children who are not the subject of this case. In 2006, the parents were using cocaine and heroin while caring for their one-year-old son. The child was seen eating his own feces in a home with roaches while the parents were "high." The child had scars from cigarette burns. Later, the child began living with family members. In 2008, Mother tested positive for cocaine and cannabis while pregnant with another child. The Department obtained temporary managing conservatorship over the child. Ultimately, in 2009, a court issued decrees in suits affecting the parent-child relationships for each child, awarding sole managing conservatorship of the children to their maternal grandfather. The court found that appointment of the parents would not be in the children's best interests because it would significantly impair the children's physical health or emotional development. The parents were

---

[2] We use fictitious names for the children. *See* Tex. R. App. P. 9.8.

3

appointed possessory conservators with limited and supervised possession and access to the children.

## B. Drowning Incident and Criminal Case

The caseworker testified that the three children in this case initially came into the Department's care due to an incident of child endangerment. While Mother was standing nearby, she allowed the children to nearly drown in a pond of water. Mother testified, describing the March 2020 incident as follows:

> We were just standing around the lake and my kids, they were just playing. And my daughter, she accidently jumped in or I guess she thought it was a pool or something. And as I was saving her, my son accidently jumped in as well, and then I was trying to get both of them at the same time. And then a neighbor jumped in and saved us all from the lake. It was a total accident. I didn't not respond to them. I was in the water as well. I was helping with trying to get them away from the pond. And at the time when the police came, they asked me to open the door, but my husband said he didn't think that we should open the door at the time, so that's why I was charged with child endangerment.

She testified that the children did not have a ball, and when the daughter jumped in the water, she had a tablet with a protective case in her hand, "so she was floating on top of the tablet." Mother testified that not all the children went into the pond. She testified that neither she nor the children could swim.

A video recording of the drowning incident, which appears to be from a security camera, was admitted as an exhibit. It appears to show Alex, the youngest child, knocking a ball into the pond. Leyla, the middle child, enters the pond to retrieve it, struggles, and drops another floating object in the water before exiting the pond. Andy, the oldest child, and Leyla go back into the water apparently to try to retrieve the object. They appear to struggle in the water while Mother stands by watching. About thirty seconds later, Alex goes into the water. Mother

4

retrieves Alex over the course of about thirty seconds. After another thirty seconds, Mother retrieves Leyla's limp body and tosses her to the ground near the pond. Mother again slowly wades into the water over the course of about forty seconds until bystanders arrive and help rescue Andy. He had been in the water nearly two and a half minutes before being rescued. Throughout this time, the children in the water can be seen struggling and bobbing up and down while drowning. According to the removal affidavit, a neighbor ran about half a mile to take Andy out of the pond.

As a result of this incident, the State indicted Mother for endangering a child. *See* Tex. Penal Code § 22.041(c). One of her bond conditions was to have no contact with her children. She pleaded guilty and was placed on deferred adjudication community supervision in November 2021.

## C. Mental Health, Service Plan, and Drug Use

After Mother was arrested and released from jail, she was admitted to the UT Psychiatric Center in April 2020. The caseworker testified that Mother's mental health diagnoses included adjustment disorder, schizoaffective disorder, and bipolar disorder. The removal affidavit noted that Mother was diagnosed with psychosis, bipolar disorder, and schizophrenia.

According to one of Mother's doctors at the UT Psychiatric Center, Mother said she had not been taking her mental health medications for two months prior to the drowning incident. The doctor noted that Mother had been admitted previously for depression with psychotic features. Family members had reported that Mother's condition was getting worse. At the UT Psychiatric Center, Mother was administered medications, and her hallucinations were getting better. Mother was "only hearing whispers and not loud voices in her head." The doctor noted that

5

Mother was "coming off of a psychotic state." The doctor stated that if Mother remained compliant with her medications, she would be okay.

Mother's sister testified that she had observed Mother experience psychotic episodes in the past, and it made the sister concerned for the children's safety. She described an incident that happened about four years before trial in which Mother "just took off walking." When Andy followed Mother, she got on a bus and left. The sister got the children and took them to their grandmother's house. This incident caused Andy stress and "hurt him."

Mother signed a family service plan in September 2020, and the court approved the service plan in November 2020. The service plan described medication compliance as a required action: "[Mother] will need to provide the agency and courts with verification of medication compliance from her doctor. This will be an ongoing task. The verification will need to be provided every doctors appointment, or every 30 days." The plan required Mother to have stable housing with verification in the form of a lease with her name on it or a letter from management. The plan also required Mother to complete random drug screenings and follow all recommendations of a substance abuse assessment.

The caseworker testified that Mother did not complete her family service plan because Mother did not have proof of stable housing. Although Mother produced a lease with her and Father's name on it, Mother did not plan to live there. Furthermore, Mother was not compliant with medication management, was not consistently attending appointments, and was unsuccessfully discharged from individual therapy due to a failure to verbalize and understand her role in the CPS case. The caseworker testified that Mother was not refilling her medications on time nor attending all her medication review follow-ups with MHMRA. The caseworker agreed that Mother had completed her other services and had been

"trying to work her services the best that she has the ability to do even though she is a parent with a disability."

Mother testified that she completed everything related to her service plan except individual therapy, which she was still currently undertaking. Mother did not testify explicitly about whether she was taking her mental health medications consistently. She testified, however, that her doctor "gives me medicine to take if I ever was to have any depression."

As noted above, the Department documented Mother's drug use in 2006 and 2008, including her drug use while pregnant with one of her other children. The caseworker testified that Mother also tested positive for cocaine in January 2021, methamphetamine in May 2021, and alcohol in April 2022. Mother tested negative for drugs multiple times during the case, but she was a "no show" for six drug tests in 2021. Mother testified that she used marijuana after her children were born "maybe at a party or something over the weekend or something, but never while caring for them."

## D.    Visitations and Bond with Mother

Although Mother was prohibited from visiting the children for about a year and a half due to the bond conditions of her child endangerment charge, she was able to start visitations sometime between the dates of trial. The caseworker testified that Mother had been compliant with her visitations and was appropriate during the visitations. The children were clearly bonded with Mother and love her. The caseworker agreed that it was "possible" or even "likely" that separating the children from Mother would be a "detriment" to them.

## E.    Foster Care, Adoption Plans, Special Needs, and Support

The children had been in foster care for nearly two years. The foster mother testified that the children adjusted well to her home, and she was bonded with them. Her understanding was that the children wanted to live with her and her family. The foster mother's goal was for her and her husband to adopt the children. She testified that all the children made improvements while living in their home. She testified that even if parental rights were terminated, she would allow the children visits with their parents.

The oldest child, Andy, has special needs. He is on the severe end of the autism spectrum. He has been receiving occupational therapy and speech therapy while living with the foster family. He receives personal care services multiple times per week through Medicaid, which would continue with the child wherever he is placed. The foster mother testified that she is a former "head start" teacher and director of a day care. She currently works with special-needs children. She is certified in special education and has completed crisis prevention training to help calm children down if they become enraged.

## F.    Judgment and Findings

The trial court signed a final judgment terminating parental rights. Regarding Mother, the court made necessary findings to terminate parental rights based on statutory predicate grounds (E), (L), (O), and (P). *See* Tex. Fam. Code § 161.001(b)(1)(E), (L), (O), (P). The court found that termination was in the children's best interests. And the court appointed the Department as the children's sole managing conservator.

## III. SUFFICIENCY OF THE EVIDENCE: ENDANGERMENT FINDING

In her first four issues, Mother challenges the sufficiency of the evidence to support the trial court's four predicate findings. Because sufficient evidence is needed for only one predicate finding to affirm the trial court's judgment, and the Section 161.001(b)(1)(E) finding is dispositive, we address it first. *See In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *8 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.).

Under subsection (E), a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct which endangers the physical or emotional well-being of the child. Tex. Fam Code § 161.001(b)(1)(E). The term "endanger" means the child was exposed to loss or injury or jeopardized. *In re C.A.B.*, 289 S.W.3d 874, 882 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Endangerment encompasses more than a threat of metaphysical injury or possible ill effects of a less-than-ideal environment. *Id.* (citing *Boyd*, 727 S.W.2d at 533). The statute does not require that conduct be directed at a child or cause actual harm; rather, it is sufficient if the conduct endangers the physical or emotional well-being of the child. *Id.* at 883; *see In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021).

Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re V.A.*, 598 S.W.3d 317, 331 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). In determining whether there is a sufficient course of conduct, a court may consider the parent's actions and inactions occurring both before and after a child's birth, and before and after the child was removed from

the parent's home. *In re F.M.E.A.F.*, 572 S.W.3d 716, 736 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

Here, Mother's use of narcotics and the effect on her ability to parent qualifies as an endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d at 345 & n.4. The Department linked Mother's use of cocaine and heroin to one of Mother's children eating feces and adduced evidence that Mother tested positive for cocaine, methamphetamines, and alcohol even after the subject children were removed from her care.

More importantly, however, Mother stood by and watched her children nearly die from drowning. Although she slowly removed two of her children from the water, Andy was struggling for nearly two and a half minutes before bystanders arrived to rescue him. Mother was discharged from therapy because of her inability to understand her role in the incident, and her testimony at trial conflicted with the video evidence. To the extent her conduct during the drowning incident and inability to accept her role resulted from her mental illness and psychosis, the Department adduced evidence that Mother failed to take her mental health medications for several months before the incident and was not compliant with her medications and doctor visits after the children were removed from her care. When a parent's mental state allows her to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the termination decision. *In re F.M.E.A.F.*, 572 S.W.3d at 737. Her failure to take medications for her mental illness can demonstrate an endangering course of conduct. *See id.* (considering failure to take medications for bipolar disorder which caused parent to become unstable and suicidal); *In re K.L.P.*, No. 14-18-00582-CV, 2018 WL 6684275, at *8 (Tex. App.—Houston [14th Dist.] Dec. 20, 2018, pet. denied) (mem. op.) (considering parent's failure to take medications for

10

schizophrenia, thus subjecting children to unpredictable behavior); *In re S.R.*, 452 S.W.3d 351, 363–65 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering parent's failure to take medications for mental illness and comply with services to improve mental health).

Considering all the evidence, including disputed evidence, a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct which endangers the physical or emotional well-being of the children. The evidence is legally and factually sufficient to support the trial court's finding.

Mother's first issue is overruled.

## IV. SUFFICIENCY OF THE EVIDENCE: BEST-INTEREST FINDING

In her fifth issue, Mother challenges the sufficiency of the evidence to support the trial court's finding that termination was in the children's best interests.

The purpose of the State's intervention in the parent-child relationship is to protect the best interest of the child, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re B.J.C.*, 495 S.W.3d 29, 35 (Tex. App.—Houston [14th Dist.] 2016, no pet.). But there is also a presumption that the permanent placement of a child in a safe environment is in a child's best interest. Tex. Fam. Code § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d at 39 (noting that a child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best-interest determination). The best-interest analysis is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

11

In assessing whether the evidence is sufficient to prove that termination is in the best interest of a child, we may consider the non-exclusive factors discussed in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (1976). *See In re E.C.R.*, 402 S.W.3d 239, 249 & n.9 (Tex. 2013). These factors include (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* (citing *Holley*, 544 S.W.2d at 371–72). We may also consider the statutory factors in Section 263.307 of the Family Code, including (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of harm to the child; (3) the results of psychiatric or psychological evaluations of the child's parent; (4) any history of the parent's substance abuse; and (5) the willingness and ability of the parent to complete counseling services and to effect positive environmental and personal changes within a reasonable period of time. *See* Tex. Fam. Code § 263.307(b); *In re A.R.M.*, No 14-13-01039-CV, 2014 WL 1390285, at *9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.).

## A.    Children's Desires, Needs, Placement, and Plan

The evidence is uncontested that the children and Mother love each other and are bonded. The caseworker acknowledged that Mother's visits with the children were appropriate, and it would possibly or likely be a "detriment" to the

children to separate them from Mother. However, the caseworker testified that Mother did not provide the Department with evidence of stable housing.

The foster mother testified that she was also bonded with the children, who had been living with her for two years, and that she would continue to facilitate the familial bond with Mother even if parental rights were terminated. The foster parents were planning to adopt the children and provide them with a safe and stable home. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (plans for adoption relevant to best interest). Indeed, the foster mother had training and experience working with special-needs children like Andy, who needs extra care and assistance due to his severe autism.

## B. Parent's Acts and Omissions Causing Harm, Mental Health, Substance Abuse, and Excuses

The Department adduced evidence that Mother is "okay" when she is properly medicated. However, before allowing her children to nearly drown, she had gone off her medications for two months, which allowed Mother to enter a "psychotic state," experience hallucinations, and hear voices in her head. She was unsuccessfully discharged from therapy after the children were removed from her care because she refused to accept her responsibility for the drowning incident and was not refilling prescriptions for her mental health medications. Mother did not contradict this evidence. She acknowledged that she has medications to take "if I ever was to have any depression." From this evidence, the court could have inferred that Mother would take her medications only if she felt symptoms of depression, rather than regularly as prescribed and as necessary to maintain her mental health and stability.

Even if Mother's mental health condition would excuse her conduct during the drowning incident, her failure to consistently remain medicated to prevent or

reduce the likelihood of harm to her children is not excused. And although the evidence did not establish a significant frequency of Mother's psychotic episodes, the drowning incident was severe and nearly cost the lives of one or more of her children.

Moreover, Mother demonstrated a history and pattern of substance abuse—while caring for a child, while pregnant, and after the children were removed from her care. Although Mother claimed only to use marijuana and while not around her children, the court could have disregarded her self-serving testimony in light of other evidence.

## C.    Summary

Although a child's love for their parent is an important consideration in determining the child's best interest, this bond cannot override or outweigh evidence of danger to the child. *In re. F.M.E.A.F.*, 572 S.W.3d at 732. Mother exposed her children to danger by failing to comply with necessary medical treatment for her mental illnesses, allowing her children to nearly drown, and continuing to use illegal substances after her children were removed from her care. Her conduct indicates that the parent-child relationship is improper and demonstrates an unwillingness or inability to effect positive changes within a reasonable period of time.

Considering all the evidence, including disputed evidence, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests. The evidence is legally and factually sufficient to support the trial court's finding.

Mother's fifth issue is overruled.

14

## V. CONSERVATORSHIP

In her sixth issue, Mother contends that the trial court abused its discretion by appointing the Department as the children's sole managing conservator and not appointing Mother as a managing conservator.

Appellant relies on cases applying the statutory presumption for parents to be appointed as managing conservators unless the trial court finds that the appointment would not be in a child's best interest because the appointment would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code § 153.131. However, a trial court need not make such a finding following a termination of the parent's rights because the former parent is no longer a "parent" following the termination. *See Z.A.R. v. Tex. Dep't of Family & Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *15 (Tex. App.— Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.).

Under Section 161.207(a) of the Family Code, following a termination of all parents' rights, a court "shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code § 161.207. The trial court's appointment of the Department as the sole managing conservator of a child is considered a "consequence of the termination" pursuant to Section 161.207. *In re V.A.*, 598 S.W.3d 317, 334 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *see also In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam).

A trial court's conservatorship decision is subject to review for an abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Because the trial court terminated the parents' rights to the children, we cannot say the trial court's decision to appoint the Department—an agency statutorily identified as an eligible managing

15

conservator—instead of Mother was arbitrary or unreasonable.  *See In re V.A.*, 598 S.W.3d at 334.

Mother's sixth issue is overruled.

## VI.  CONCLUSION

Having overruled Mother's issues necessary to the disposition of the appeal, we affirm the trial court's judgment.

/s/     Ken Wise
Justice

Panel consists of Justices Wise, Jewell, and Poissant.  (Poissant, J., concurring).