**Affirmed and Memorandum Opinion filed January 26, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00571-CV

## IN THE INTEREST OF C.W.M.P., JR. A/K/A C.P., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2019-02534J**

## M E M O R A N D U M   O P I N I O N

The trial court signed a "Decree of Termination" terminating Mother's and Father's parental rights with respect to their two-year-old son, C.W.M.P., Jr. a/k/a C.P. ("Charlie").[1]  Mother and Father appeal the decree and challenge the trial court's finding that termination of their parental rights is in Charlie's best interest; Mother also challenges the trial court's predicate termination findings under Texas Family Code section 161.001(b)(1)(D) and (E).  Father raises two additional issues

---

[1] We refer to Mother's and Father's child using a pseudonym.  *See* Tex. Fam. Code Ann. § 109.002(d).

on appeal, concerning the trial court's (1) denial of his motion for continuance and (2) appointment of the Texas Department of Family and Protective Services (the "Department") as Charlie's sole managing conservator.

For the reasons below, we overrule Mother's and Father's issues on appeal and affirm the trial court's "Decree of Termination".

## BACKGROUND

Charlie was born in the summer of 2018 and came to the Department's attention when he was approximately four weeks old. The Department initially handled Charlie's case through family-based safety services[2] and Charlie was placed with a family friend via one of Mother's cousins. Charlie has lived with the family friend since he was ten weeks old.

After "very little movement on either parent's part in doing the [family-based safety] services", the Department filed suit to terminate Mother's and Father's parental rights. The parties proceeded to a two-day bench trial in summer 2020. Due to the COVID-19 pandemic, the trial was held via Zoom, a videoconferencing platform. Three witnesses testified at trial: Mother, Father, and Devante Jones, the Department caseworker assigned to Charlie's case.

We begin with a recitation of the testimony and evidence presented at trial.

## I. Evidence

### A. Jones' Testimony

According to Jones, Charlie came to the Department's attention for

---

[2] Family-based safety services are designed to maintain children's safety in their homes — or make it possible for the children to return home — by strengthening the ability of families to protect their children and reducing threats to the children's safety. *See* Tex. Dep't of Family & Protective Servs., *Family-Based Safety Servs. (FBSS)*, https://www.dfps.state.tx.us/child_ protection/Family_Support/fbss.asp (last visited Jan. 21, 2021).

"[n]eglectful supervision and medical neglect" after he was not present at a medical appointment required for newborns. Jones testified that this was concerning because "[M]other was not making sure that [Charlie] was receiving proper care at the time. And at that time, [Mother] stated that she was being controlled and abused by [Charlie's] father." Jones said Mother did not provide any additional information with respect to the controlling nature of her relationship with Father.

Jones testified that both parents took drug tests when the Department first became involved in Charlie's case and both tested positive for methamphetamines. Jones said the Department began seeking family placement for Charlie and initially considered Charlie's paternal grandmother ("PGM"). Jones testified that the Department decided against placing Charlie with PGM after it became clear that Father was still living with PGM and using drugs. One of Mother's cousins took Charlie in but ultimately was unable to care for him. Charlie was placed with a cousin's family friend and has been living there since he was approximately ten weeks old.

The Department took temporary managing conservatorship of Charlie on July 9, 2019, and family service plans for Mother and Father were filed in August 2019. The family service plans ordered Mother and Father to complete certain services, including parenting classes, substance abuse assessments, random drug screenings, and other parenting and stability objectives.

Jones testified that:

- Mother did not attempt to start the services in her plan and only completed several of the random drug screenings;
- he has "good communication" with Mother but "it's like [Mother] wanted to complete services, but she — I don't know. I guess she didn't have the drive to complete it";

3

- Mother's hair specimens "have continuously shown the presence of cocaine and methamphetamine";[3]

- Mother underwent one urinalysis that tested negative for drugs but her other urine screenings were positive for cocaine or methamphetamine;

- Mother has "struggled with substance abuse" for "a while" and was arrested for possession of methamphetamines in April 2020;

- Mother told him she previously had used drugs with Father;

- Mother previously had been arrested for domestic violence;

- Mother has been "in and out of jails in Harris, Galveston, and Brazoria County";

- Mother "is currently under indictment in Brazoria County for assault family violence, second offense";

- Mother has four additional children;

- Mother does not have primary care of her other children but also has not had her parental rights terminated;

- Mother's history with the Department includes "[n]eglectful supervision for the kids and drug abuse, and — as well as criminal activity";

- Mother visited Charlie once in 2019 and three or four times in 2020;

- Mother missed approximately four or five visits with Charlie;

- he secured a court order requiring Mother to let Jones know 24 hours in advance if she was going to attend a scheduled visit with Charlie;

- Mother had not been complying with the court order; and

- he did not know where Mother currently lived.

Turning to Father, Jones testified that Father was arrested in October 2019 for a parole violation; Jones did not have any knowledge regarding the underlying offense. Jones said Father was released approximately a week before the

---

[3] Admitted into evidence were Mother's drug screenings from October 4, 2018, April 24, 2019, and July 15, 2019, all of which show Mother's hair samples testing positive for amphetamine, methamphetamine, and cocaine.

underlying trial started. Jones testified that he talked to Father once or twice a week while Father was incarcerated. According to Jones, Father completed a substance abuse assessment while incarcerated and "has always expressed a willingness to work" his service plan.

Jones said Father has one other child aside from Charlie; Father's other child lives with PGM and Father is managing conservator with respect to that child. Jones testified that, like Mother, Father's history with the Department includes allegations of neglectful supervision, drug abuse, and criminal activity.

Finally, discussing Charlie's current placement, Jones said Charlie is "doing well" and that the "long term goal" was for Charlie to be adopted by his current placement. Jones testified that Charlie "has a very good support system" with his current placement and stated that "Mother and [F]ather ha[ve] not been able to prove that they will maintain stability and safety" for Charlie. Jones recommended continuing Charlie's current placement.

## B. Father's Testimony

Father testified that the initial plan after Charlie's birth was for Charlie to be cared for by Father, Mother, and PGM. Shortly after Charlie's birth, Father recalled that Mother "called the cops" on Father "[b]ecause at the time [Father] was keeping [Mother] from, like, doing drugs and stuff, and that's why she said [Father] was controlling and stuff." Father said Mother left the house with Charlie and that "was the last time [he] saw [Charlie] for quite some time". According to Father, the Department initially did not allow him to visit Charlie because the Department was investigating Charlie's paternity.

Father testified that he was arrested in February 2019 for violating a condition of his probation and remained in custody until July 2019. Father was

5

arrested again in October 2019 for violating a condition of his probation and remained in custody until June 2020. Describing the underlying offense, Father said he "got in a car wreck under the influence of alcohol."

Father said he completed a substance abuse program while he was incarcerated and was treated for an addiction to methamphetamines. Father testified that he started using illegal drugs when he was 18 and used methamphetamines for approximately five years. Father acknowledged using drugs with Mother but said it did not occur very often. In his substance abuse program, Father said he "learned that there's better things to do than drugs." Father testified that he also completed an anger management class while incarcerated.

Father also said he has two additional children. Father testified that one of the children is cared for by PGM and the other child lives with the child's mother. Father requested that PGM be considered as placement for Charlie.

Father said he is currently residing in a halfway house and working at a construction site. Father said he plans to remain at the halfway house through August 2020 and, after that time, will have "close to" enough money saved to get his own place.

## C. Mother's Testimony

Testifying on the first day of trial, Mother said she was 26 years old and had five children, including Charlie. Mother said she has a relationship with all five of her children and has not had her parental rights terminated with respect to any of them. Mother said she "d[idn]'t really know" Charlie's current caregiver and described him as "a friend of extended family". Mother requested Charlie be placed with either her mother or PGM.

6

After this testimony, Mother's connection to the videoconference was terminated. Mother's attorney said she was unable to reach Mother and, when she called Mother's phone, the call went directly to voicemail. Trial was recessed for eight days to permit Mother to testify.

When trial resumed, Mother's attorney informed the trial court that Mother "is aware of the hearing today; but, again, she is not here." Mother did not present any additional testimony.

## II.      Trial Court's Findings

In its "Decree of Termination", the trial court found that termination of Mother's and Father's parental rights was in Charlie's best interest and warranted under three subsections of section 161.001(b)(1) of the Family Code: (D) (endangerment by environment), (E) (endangerment by conduct), and (O) (failure to comply with a court-ordered plan for reunification with the child). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). The trial court appointed the Department as Charlie's sole managing conservator. Mother and Father appealed.

ANALYSIS

Mother raises two issues on appeal:

1.    the trial court's predicate findings under Texas Family Code section 161.001(b)(1)(D) and (E) are not supported by legally and factually sufficient evidence; and

2.    the trial court's best interest finding is not supported by legally and factually sufficient evidence.

Father raises three issues in his appeal:

1.    the trial court's best interest finding is not supported by factually sufficient evidence;

2.    the trial court abused its discretion by denying Father's motion for continuance; and

7

3.    the trial court abused its discretion by appointing the Department as Charlie's sole managing conservator.

We begin by addressing Mother's challenge to the trial court's predicate findings under section 161.001(b)(1)(D) and (E). We then consider together Mother's and Father's challenges to the trial court's best interest finding. We conclude by addressing Father's remaining issues.

## I.    Burdens of Proof and Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, a child's emotional and physical interests should not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

This heightened burden of proof results in heightened standards of review for evidentiary sufficiency. *In re V.A.*, 598 S.W.3d 317, 327 (Tex. App.—Houston [14th Dist.] 2020, no pet.). For a legal sufficiency challenge, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all controverting evidence a reasonable fact finder could

disbelieve. *Id.*

For a factual sufficiency challenge, we consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re C.H.*, 89 S.W.3d at 25. We examine whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *Id.*

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" *In re V.A.*, 598 S.W.3d at 328 (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003)).

## II.    Predicate Findings Under Section 161.001(b)(1)(D) and (E)

With respect to Mother, the trial court made predicate termination findings under subsections (D), (E), and (O) of section 161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). Mother asserts the trial court's findings under subsections (D) and (E) are not supported by legally and factually sufficient evidence. Mother does not challenge the trial court's termination finding under subsection (O).

Only one predicate finding under section 161.001(b)(1), along with the best interest determination, is necessary to support termination. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re V.A.*, 598 S.W.3d at 327. Given the collateral consequences of affirming termination under subsections (D) and (E), we must also address Mother's evidentiary sufficiency challenges with respect to these predicate grounds. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam);

9

*see also* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing for the termination of parental rights if there is clear and convincing evidence that the parent has had his or her parental rights terminated with respect to another child based on a finding that the parent's conduct violated subsection (D) or (E)). Due process requirements also mandate that an appellate court detail its analysis for an appeal of termination rights under subsections (D) and (E). *In re P.W.*, 579 S.W.3d 713, 720 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

### A. Law

Subsection (D) authorizes termination if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection (E) authorizes termination if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). In these contexts, "endanger" means "to expose to loss or injury; to jeopardize". *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health."). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that the conduct was directed at the child or that the child actually suffered injury. *In re M.C.*, 917 S.W.2d at 269.

Subsections (D) and (E) differ with respect to the source of the danger to the child. Endangerment under (D) focuses on evidence related to the child's environment, *i.e.*, the acceptability of living conditions as well as the parent's conduct in the home. *In re S.R.*, 452 S.W.3d at 360; *In re J.D.*, 436 S.W.3d 105,

114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical or emotional well-being of a child as required for termination under subsection (D). *In re S.R.*, 452 S.W.3d at 360. "Although the parent need not have certain knowledge that an actual injury is occurring, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk." *In re J.D.*, 436 S.W.3d at 114. Parental rights may be terminated under subsection (D) based on a single act or omission. *In re V.A.*, 598 S.W.3d at 329.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Unlike subsection (D), termination under subsection (E) must be based on more than a single act or omission — "the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.*

Although endangerment under subsection (E) often involves physical endangerment, the statute does not require that the conduct be directed at a child or that the child actually suffer physical injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* "As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

In evaluating endangerment under subsection (D), we consider the child's environment before the Department obtained custody of the child. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection (E), however, courts may consider conduct both before and after the

11

Department removed the child from the home. *In re S.R.*, 452 S.W.3d at 360.

## B. Application

After reviewing the record, we conclude legally and factually sufficient evidence supports the trial court's predicate findings under subsections (D) and (E).

Beginning with subsection (D), evidence of Charlie's environment before he left Mother's care shows Mother knowingly allowed Charlie to remain in conditions that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D); *see also In re J.R.*, 171 S.W.3d at 569. Specifically, Mother permitted Charlie to live in an environment where she and Father used illegal drugs in a manner that endangered Charlie's physical or emotional well-being. *See In re L.C.L.*, 599 S.W.3d 79, 84-86 (Tex. App.— Houston [14th Dist.] 2020, pet. filed) (en banc) (to support a finding under subsection (E), there must be a showing of a causal connection between the parent's drug use and endangerment to the child).

The Department became involved in Charlie's case when he was approximately four weeks old, after he did not appear for an appointment required for newborns. According to Jones, this was concerning because "[M]other was not making sure that [Charlie] was receiving proper care". Jones testified that Mother and Father took drug tests at this time and both tested positive for methamphetamines. According to testimony from Father and Jones, Father and Mother had a history of using illegal drugs together.

Based on other evidence presented at trial, the trial court reasonably could have found that Mother's and Father's drug use incurred ramifications beyond Charlie's missed newborn appointment. When the Department intervened with the

12

family, Mother reported (without evidence or specifics) that she was "being controlled and abused" by Father. But according to Father, Mother only reported he was controlling because he "was keeping [Mother] from, like doing drugs and stuff." Regardless of which account is true, both support the finding that Mother allowed Charlie to live in an unstable environment that endangered his physical and emotional well-being. *See In re K.F.C.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) ("a parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in subsection (D)").

In sum, evidence of Mother's and Father's drug use, coupled with the incidents discussed above, is legally and factually sufficient to support the trial court's predicate finding under subsection (D). Neither disputed nor contradicted, this evidence would permit the trial court to form a firm belief or conviction that Mother knowingly allowed Charlie to remain in conditions that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D).

Turning to subsection (E), evidence from before and after Charlie's removal from Mother's care supports the finding that Mother engaged in a course of conduct that endangered Charlie's physical and emotional well-being. *See id.* § 161.001(b)(1)(E); *see also In re S.R.*, 452 S.W.3d at 360. Jones testified at trial that Mother's hair samples continuously tested positive for methamphetamine and cocaine; exhibits from Mother's October 2018, April 2019, and July 2019 drug screenings show that her hair tested positive for amphetamine, methamphetamine, and cocaine. Mother also was arrested for possession of methamphetamine in April 2020.

There is also evidence Mother engaged in additional criminal activity. *See In re L.M.*, 572 S.W.3d 823, 834 n.4 (Tex. App.—Houston [14th Dist.] 2019, no

pet.) ("Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct."). Jones testified (without a presented and preserved objection) that Mother previously had been arrested for domestic violence and agreed that Mother has been "in and out of jails in Harris, Galveston, and Brazoria County". According to Jones, Mother was under indictment in Brazoria County for "assault family violence, second offense" at the time of trial. Jones also testified that, with respect to her other children, Mother's history with the Department included neglectful supervision, drug abuse, and criminal activity. *See In re P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (when reviewing an endangerment finding under subsection (E), "the parent's treatment of other children must be considered").

Jones testified that Mother visited Charlie once in 2019 and three or four times in 2020; Mother also missed approximately four or five visits with Charlie. This evidence shows that Mother has not made a conscientious effort to maintain her parental relationship with Charlie. *See In re A.R.M.*, 593 S.W.3d 358, 371-72 (Tex. App.—Dallas 2018, pet. denied) ("missed visits with the child" relevant to an endangerment finding under subsection (E)). According to Jones, he secured a court order requiring Mother to notify him 24 hours in advance if she was going to attend a scheduled visit with Charlie — an order with which Mother did not comply. Finally, although the trial was recessed after Mother's connection to the videoconference was terminated, she did not attend the second day of trial. According to Mother's attorney, Mother was "aware of the hearing today; but, again, she is not here."

This evidence of Mother's continued drug abuse, criminal history, her relationships with her other children, and her relationship with Charlie constitutes

legally and factually sufficient evidence to support the trial court's subsection (E) finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). We overrule Mother's challenges to the trial court's predicate findings under subsections 161.001(b)(1)(D) and (E).

## III.     Best Interest Finding

The trial court found that termination of Mother's and Father's parental rights is in Charlie's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). Mother and Father challenge this finding on appeal; Mother asserts the finding lacks legally and factually sufficient evidence and Father raises a factual sufficiency challenge.

### A.     Law

The purpose of the Department's intervention in the parent-child relationship is to protect the best interest of the child, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d at 361; *In re F.M.E.A.F.*, 572 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). "There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship." *In re F.M.E.A.F.*, 572 S.W.3d at 726.

In determining whether the evidence is sufficient to prove that termination is in the child's best interest, we may consider the non-exclusive factors discussed in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). *See, e.g., In re F.M.E.A.F.*, 572 S.W.3d at 726-35. These factors include (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by

15

the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id*. at 726 (citing *Holley*, 544 S.W.2d at 371-72). A best interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *Holley*, 544 S.W.2d at 371-72.

The best interest analysis focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best interest determination. *In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

## B. Application

We begin by addressing collectively Charlie's desires, his present and future physical and emotional needs, the parental abilities and plans for Charlie by the individuals seeking custody, and the stability of the home or proposed placement. *See Holley*, 544 S.W.2d 371-72 (*Holley* factors (1), (2), (4), (6), and (7)). Regarding the desires of the child, Charlie was removed from Mother's and Father's care when he was approximately four weeks old and was two years old at the time of trial. When children are too young to express their desires, the fact finder may consider whether the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with the parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). These considerations are supported by the evidence presented at trial: Jones testified that Charlie is "doing well" with his current placement, and that the "long term goal" was for Charlie to be adopted by his current placement (with whom he had "a good support system"). Both Mother and Father have spent

16

minimal time with Charlie since he was removed from their care: Mother saw Charlie once in 2019, three or four times in 2020, and has missed numerous scheduled visits while Father has been incarcerated for most of Charlie's life.

Testifying at trial, the only plans Father expressed for Charlie were that Charlie be placed with PGM. Similarly, Mother requested Charlie be placed with her mother or PGM. Limited evidence was presented with respect to these individuals' parenting abilities, plans for Charlie, or abilities to implement those plans. With respect to PGM, Jones testified that the Department recommended against Charlie's placement with her because PGM's history with the Department included allegations of emotional abuse, sexual abuse, and neglectful supervision. No evidence was presented with respect to Charlie's placement with Mother's mother.

Other evidence suggests that neither Mother nor Father would be able to provide a stable home for Charlie. Father has been incarcerated for most of Charlie's life and, at the time of trial, was living in a halfway house and trying to save enough money to live on his own. With respect to Mother, Jones testified that he did not know where Mother currently resided; Jones also said that Mother did not have primary care with respect to her other children. Mother also did not attend both days of trial.

We next consider evidence of present or future emotional and physical danger to Charlie, the parents' acts or omissions which may indicate that the existing parent-child relationship is improper, and any excuses for those acts or omissions. *See Holley*, 544 S.W.2d at 371-72 (*Holley* factors (3), (8), and (9)). As we discussed above, Mother has a history of substance abuse and criminal activity. Mother also has not made a conscientious effort to maintain her relationship with Charlie and did not appear at the second day of trial even though, according to her

17

attorney, Mother was aware of the trial setting. No evidence was offered to excuse these acts and omissions. Similarly, the evidence shows that Father also has a history of substance abuse and criminal activity and no evidence was offered as a defense to this behavior. These patterns of behavior would pose significant emotional and physical danger to Charlie.

Finally, we consider the programs available to assist the individuals seeking custody to promote Charlie's best interests. *See Holley*, 544 S.W.2d at 371-72 (*Holley* factor (5)). Jones testified that family service plans were ordered for Mother and Father; the plans instructed Mother and Father to complete certain services (including parenting classes), substance abuse assessments, random drug screenings, and other parenting and stability objectives. Jones said Mother did not attempt to start the services in her plan and only completed several drug screenings. All of Mother's hair screenings continuously showed the presence of cocaine and methamphetamine.

Turning to Father, the evidence showed that he completed a substance abuse assessment and an anger management class while incarcerated. Jones testified that Father "has always expressed a willingness to work" his service plan.

While the *Holley* factors are not exclusive and need not all be satisfied to support a best interest finding, here most of the individual factors weigh in favor of the trial court's finding. We conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's and Father's parental rights is in Charlie's best interest. We overrule Mother's and Father's challenges to this finding.

## IV. Father's Motion for Continuance

In his second issue, Father asserts the trial court abused its discretion by

denying his motion for continuance. Father contends a continuance was warranted (1) because "the Department had not had the opportunity to study the PGM" as a potential placement for Charlie, and (2) to permit Father's attorney to fully prepare Father for trial.

A trial court abuses its discretion if its ruling was arbitrary, unreasonable, or without reference to any guiding rules or principles. *In re S.M.H.*, 523 S.W.3d 783, 797 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Motions for continuance are governed by Texas Rule of Civil Procedure 251, which provides that the motion shall not be granted except for sufficient cause supported by an affidavit, consent of the parties, or by operation of law. Tex. R. Civ. P. 251. Accordingly, "motions for continuance generally must be in writing, state the specific facts supporting the motion, and be verified or supported by an affidavit." *In re C.F.*, 565 S.W.3d 832, 844 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). When a motion for continuance does not comply with the rules — for example, when the motion is unwritten or unsupported by verified facts — appellate courts generally presume the trial court did not abuse its discretion in denying the motion. *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *see also In re L.N.C.*, 573 S.W.3d 309, 321 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

Here, Father's motion for continuance was not supported by affidavit. Further, the record reflects that the Department objected to Father's request for a continuance and Father has not shown that the continuance was required by operation of law. These considerations support the presumption that the trial court did not abuse its discretion by denying Father's motion for continuance. *See Villegas*, 711 S.W.2d at 626; *In re L.N.C.*, 573 S.W.3d at 321.

Nothing in the record overcomes this presumption. Before trial began,

Father's counsel argued to the trial court that a continuance was warranted because the Department had not "look[ed] into" PGM as a placement for Charlie. Responding to this contention, counsel for the Department asserted that the Department still planned to evaluate PGM and that evaluation would be "ongoing regardless of what we do at trial." On the second day of trial, Jones testified that the Department had completed its assessment of PGM. Jones said the placement was denied because PGM had a history with the Department involving allegations of emotional abuse, sexual abuse, and neglectful supervision. Accordingly, the need to study PGM as a placement for Charlie did not warrant a continuance — the study was completed and the placement was denied before the conclusion of trial.

We overrule Father's challenge to the trial court's denial of his motion for continuance.

## V.      Sole Managing Conservatorship

In his final issue, Father contends the trial court erred in naming the Department as Charlie's sole managing conservator because (1) the Department had not completed its assessment of PGM by the time of trial and that assessment "was critical to [Charlie's] future and well-within his best interest", and (2) the trial court "did not make independent findings that were not solely a consequence of termination".

A parent shall be named as a child's managing conservator unless the court finds that the appointment of a parent would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code Ann. § 153.131(a). Contrary to Father's contention, the trial court made this independent finding with respect to both Mother and Father in the portion of the termination decree addressing Charlie's managing conservatorship.

But when, as here, the parents' rights are terminated, section 161.207 controls the appointment of a managing conservator. *See id*. § 161.207(a); *see also In re I.L.G.*, 531 S.W.3d 346, 356-57 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Having terminated both parents' rights, the trial court was required to appoint the Department or another permissible adult or agency as Charlie's managing conservator. *See* Tex. Fam. Code Ann. § 161.207(a). This appointment may be considered a "consequence of the termination" and is reviewed for an abuse of discretion. *See In re I.L.G.*, 531 S.W.3d at 356-57.

Father's argument regarding PGM does not warrant revisiting the trial court's conservatorship determination. As we discussed above, Jones testified that the Department denied Charlie's potential placement with PGM because PGM had a history with the Department involving allegations of emotional abuse, sexual abuse, and neglectful supervision. Accordingly, the trial court did not abuse its discretion in appointing the Department as Charlie's sole managing conservator.

We overrule Father's challenge to the trial court's appointment of the Department as Charlie's sole managing conservator.

## CONCLUSION

Legally and factually sufficient evidence supports the trial court's predicate termination findings with respect to Mother under subsections 161.001(b)(1)(D) and (E). With respect to both Mother and Father, the trial court's best interest finding is supported by legally and factually sufficient evidence. Finally, the trial court did not abuse its discretion by (1) overruling Father's motion for a continuance, and (2) appointing the Department as Charlie's sole managing conservator. Therefore, we overrule Mother's and Father's challenges on appeal and affirm the trial court's "Decree of Termination".

21

/s/     Meagan Hassan
Justice

Panel consists of Chief Justice Christopher and Justices Wise and Hassan.