

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00478-CV

_____

IN THE INTEREST OF D.W., K.W., AND L.W., CHILDREN

---

On Appeal from County Court at Law No. 1
Parker County, Texas
Trial Court No. CIV-20-0558

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

D.W. (Father)[1] appeals from the judgment terminating his parental rights to his three children: David, Kayla, and Lori, who were 14, 12, and 11, respectively, at trial.[2] In the bench trial, Father, Mother, and the Our Community Our Kids (OCOK)[3] permanency specialist (caseworker)[4] testified; the children's court-appointed guardian ad litem presented her oral report; and the trial court admitted several exhibits, including the transcript of the court's in-camera conferences with each child. Mother's testimony focused on Father's long history of violence and substance abuse. The caseworker testified about Father's progress on his service plan; his failure to show meaningful, positive change in the two and one-half years preceding the trial; his negative impact on the children; and the positive changes they had experienced since their placement outside the home. The children's individual conferences with the trial court stressed why they did not want to live with Father and wished to remain in the

---

[1]We use pseudonyms for the names of the children and their family to protect the children's privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

[2]The trial court also terminated M.F.'s (Mother's) parental rights based on her affidavit of voluntary relinquishment; she did not file a notice of appeal. Because only Father appeals, the opinion focuses on evidence pertinent to the termination of his parental rights.

[3]OCOK provided conservatorship services on behalf of the Department of Family and Protective Services. *See In re J.B.*, No. 02-22-00384-CV, 2023 WL 1859766, at *3 n.9 (Tex. App.—Fort Worth Feb. 9, 2023, pet. denied) (mem. op.).

[4]According to the record, the OCOK permanency specialist working with the family in this case was "the equivalent of a CPS caseworker."

care of their maternal grandmother (Grandmother) and her husband (collectively, Grandparents). The guardian ad litem's report highlighted the children's fear of Father and their desire to have no contact with him. Father's testimony focused on denying or responding to allegations of other witnesses and maintaining his parental relationship with the children.

After receiving the evidence, the trial court announced on the record that it had found Mother's and the children's testimony "very, very credible"; the caseworker's testimony "very credible"; and Father's testimony "not credible . . . as opposed to [that of] the children and . . . [Mother and] . . . totally opposite of four witnesses[.]"

The trial court ultimately terminated Father's parental rights, specifically finding that he had:

- "knowingly placed or [had] knowingly allowed the children to remain in conditions or surroundings which [had] endanger[ed] the[ir] physical or emotional well-being";

- "engaged in conduct or [had] knowingly placed the [children] with persons who [had] engaged in conduct which [had] endanger[ed] their physical or emotional well-being";

- constructively abandoned the children; and

- "failed to comply with the provision of a court order that specifically established the actions necessary for [him] to obtain the return of the child[ren] who ha[d] been in the . . . temporary managing conservatorship of the Department . . . for not less than nine months."

3

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O).  The trial court also found that terminating Father's parental rights was in the children's best interest.  *See id.* § 161.001(b)(2).

Father does not challenge the four predicate findings supporting the termination of his parental rights.  Instead, in his only issue, he challenges the legal and factual sufficiency of the evidence supporting the best-interest finding.  Because the evidence is legally and factually sufficient to support that finding, we affirm.

## I.  STATEMENT OF FACTS

### A.  PARENTAL CONDUCT TRIGGERING REMOVAL

In May 2020, the police arrived at the family's home after Father had allegedly hit Mother repeatedly in the head with his fist and shoe.  Mother held Lori during the altercation, and Father also allegedly hit her.[5]  The other two children witnessed the incident.  Based on the domestic-violence allegations, the Department filed a petition seeking an order for the family to participate in services, and the trial court granted it in September 2020, ordering Father, Mother, and Father's mother (Grandma) to "cooperate, attend, and participate in all services and recommendations and safety planning and [p]lan of [s]ervices requested by the Department" and to "comply with all [s]afety [p]lans developed in the case."  One safety plan condition was that the children live with Grandmother.  The parents failed to complete most services.

---

[5]Family-violence assault charges remained pending against Father when the termination trial occurred.

4

While the September 2020 order was in force, Father committed two alcohol-based offenses. He committed the state-jail felony of driving while intoxicated with a child passenger—his passengers included Kayla and Lori. Father was arrested after driving through a stop sign—despite a passenger's warning—and hitting another vehicle. In a separate incident, he possessed an open container of alcohol in a motor vehicle, a Class C misdemeanor.

In May 2021, after the parents failed to comply with the safety plan, the Department filed a petition to terminate their parental rights and sought the children's formal removal. The trial court formally removed the children from their parents, naming the Department the children's managing conservator, and the children continued to live with Grandparents.

### B. FATHER'S POST-REMOVAL, PRETRIAL CONDUCT

In its June 2, 2021 temporary order, the trial court ordered the parents to submit to a psychological or psychiatric evaluation, attend counseling, successfully complete parenting classes, submit to a drug and alcohol assessment, complete drug testing as directed by the Department, and to fully comply with the Department's service plan. Father's service plan—which he signed on November 5, 2021, specifically required:

- **Financial Stability.** Father was required to show financial stability by, among other things, "provid[ing] proof of employment via paycheck stubs each month or a letter from his employer detailing his hours worke[d] and wages earned weekly."

5

- **Transportation.**  Father was required to "obtain and maintain a valid driver's license and insurance and have stable transportation" or to create a plan for transporting the children and himself.

- **Accept Responsibility.**  Father was required to accept responsibility for the children's removal, address current and future safety concerns, and show "decision[-]making skills" to reduce such concerns.

- **Housing.**  Father was required to obtain and maintain a safe home for his children and himself and to inform the caseworker of address or occupancy changes within 24 hours.

- **Parenting.**  Father was required to complete parenting classes, to show that "he underst[ood] appropriate boundaries and discipline techniques and c[ould] provide ongoing care for his children . . . [, and to] demonstrate appropriate conflict resolution and ways to avoid physical and verbal altercations."

- **Visitation.**  Father was required to timely attend all scheduled visits; to contact the caseworker if he could not attend or arrive on time; to follow visitation rules; to show "the knowledge and skills learned through the services he ha[d] been provided during any periods of access to his children . . . [; and] to appropriately engage, bond, and interact with [them.]"

- **Cooperation and Communication.**  Father was required to "keep open and honest communication with the caseworker throughout the . . . case," to "contact the caseworker within 24 hours of a phone number or address change," to "contact the caseworker 24 hours before a scheduled meeting with the caseworker or service provider or for visitation if he need[ed] to cancel or reschedule or immediately i[n] an emergency [requiring cancellation]," to "update the caseworker on progress with his family plan and classes on a constant basis," to "complete all portions of the service plan[,] and [to] follow any other recommendations the Department or service providers ha[d]."

- **No Criminal Behavior.**  Father was required to refrain from committing a crime; to report to his caseworker any contact with law enforcement within 24 hours; and to not associate with criminals, felons, or those with pending charges.

- **Drug Testing.** Father was required to show that he was maintaining a "sober and drug[-]free lifestyle" by submitting to random drug testing as directed by the Department or OCOK. The service plan noted that "[a]ny missed test for any reason w[ould] be a presumed positive test."

- **Substance-Abuse Assessment and Counseling.** Father was required "to truthfully submit to a drug/alcohol assessment"; to attend and participate in substance-abuse counseling; and to follow recommendations of the service provider, the Department, or OCOK.

- **Support System.** Father was required to develop an appropriate support system of family and friends excluding addicts and criminals and to provide the caseworker with the names of three caregivers who could babysit the children in Father's absence if he regained custody.

- **Coping Skills/Mental Health.** Father was required to complete a psychological evaluation, to follow any mental-health recommendations made by the service provider and the Department or OCOK, to show the caseworker all prescriptions, and to sign a release to allow the caseworker access to his records.

- **Individual Counseling.** Father was required to attend and participate in counseling for issues including mental-health issues, substance abuse, and domestic violence; to show what he had learned in counseling when he had access to his children; to show his ability to change harmful behavior; and to follow all recommendations.

- **Batterers Intervention and Prevention Program (BIPP).** Father was required to complete BIPP, to give the caseworker a certificate of completion, and to show his ability to defuse situations.

- **Anger Management.** Father was required to complete an anger-management course, to provide the caseworker with proof of successful completion, and to show any skills he had learned when he had contact with the children.

Father lost his visitation rights to the children just two days before he signed his service plan. On November 3, 2021, about a year before trial, the trial court

7

ordered that "all visits and communication" between Father and the children cease "until further ordered." The trial court also found in the no-contact order:

- Father had "failed to attend a substantial amount of visitations" without giving prior notice, and

- in the visits that Father had completed, he had "behaved in a manner contrary to the mental and emotional health of the children . . . and . . . [had] caused ongoing deterioration of the[ir] behaviors and well[-]being."

The trial court ordered that upon any future court-approved contact between Father and the children, Father was not to "engage in communication or language not appropriate for the age of the respective children" or "discuss any matters regarding" the case; Mother; "or any matters of an adult nature, such as continuing to discuss any previously deceased siblings of the children, or other discussions deemed inappropriate."

After the trial court signed the no-contact order, Father tried to regain legal access to the children but not in the appropriate manner. At the February 16, 2022 permanency review, Father still did not have counsel despite the trial court's having informed him of his right to counsel and his potential right to appointed counsel in the adversarial hearing eight months earlier. Father stated in the permanency-review hearing that he was going to hire an attorney, and he asked to have communication with the children. The trial court replied, "All the more reason you should hire your lawyer as soon as possible so he can make an appropriate request." Father completed the appropriate affidavit on April 13, 2022, and the trial court appointed trial counsel

8

the same day. Father again informally sought contact with the children in the next hearing on June 1, 2022, but Father's counsel did not attend. The trial court told Father to "[h]ave [his] lawyer talk for [him] and . . . speak to the CPS office about what [Father] want[ed] to do." The trial court allowed Father's first trial counsel to withdraw and appointed a replacement on October 6, 2022, a month before trial. Neither of his attorneys filed a motion to vacate or modify the no-contact order. At trial, when asked whether a "formal request [was] filed with the court to reinstate [his] visits" with the children, Father answered that he "didn't know that was even a possibility."

Evidence at trial showed that Father frequently violated the no-contact order. The caseworker testified:

- In April 2022, the children saw Father while shopping at Walmart, and Father grabbed David, Kayla fled, and Lori clutched her caregiver;

- Father went to Lori's school despite the no-contact order, frightening her; and

- Father drove by Grandparents' home and honked or yelled at the children, scaring them.

Father denied the violations. He admitted to seeing the children in Walmart but denied grabbing David, asserting instead that David had initiated contact by hugging him. Father also denied "honking or hollering or any type of thing like that or stopping at their school."

In addition to losing the ability to comply with the service plan's visitation requirement, Father completed very few of the other court-ordered services before finally obtaining counsel in April 2022. By trial, according to the caseworker, Father had completed his psychological evaluation, substance-abuse assessment, parenting courses, BIPP, and counseling. But the caseworker testified that Father had failed

- to accept responsibility for his children's removal;

- to address the Department's safety concerns;

- to provide a safe, appropriate home for the children, instead planning to house them in a singlewide trailer containing only one bed;

- to regain his visitation privileges;

- to stay in touch with the caseworker;

- to submit to several monthly drug tests from July 2021 through at least May 2022;[6]

- to provide the caseworker with the names of his support network;

- to provide sufficient information to show financial stability;

- to have a valid driver's license and insurance; and

- to show that his completion of BIPP and parenting classes had wrought positive improvement.

Regarding the service plan, Father admitted at trial that he

---

[6]The caseworker testified that Father had been compliant with the drug-test requirement since June 2022. She admitted on cross-examination that she had "not necessarily" had a reason to believe he would test positive for drugs but was more concerned about his alcohol abuse. On redirect examination, though, she explained that the Department could not know whether Father had a drug issue because he had chosen to consistently miss drug tests for several months.

- had not timely completed services,

- had missed some drug tests,

- had driven with a suspended license while on probation,

- did not have a valid driver's license at trial,

- had not told the caseworker that he was moving before she learned it elsewhere, and

- had not received all the caseworker's texts because he had not possessed a phone at times and had relied on the phones of others.

But some of Father's testimony conflicted with that of the caseworker's. He testified that he had told the caseworker that he was moving into Grandma's two-bedroom house (and she was moving into the singlewide trailer) a few days before the trial; that he had texted the caseworker when he could not take drug tests and had explained why; and that he had offered to provide the caseworker with more paystubs if she wanted them, but she did not respond. He also denied currently using drugs or alcohol and stated that he had taken at least six drug tests and could pass a drug test at trial.

### C. FATHER'S ENDANGERING CONDUCT

Although Father denied it, the bulk of the evidence showed that he had chronically abused substances and his family. Mother and Father began dating in high school and were in an exclusive relationship for about fifteen years. According to Mother:

- Father's domestic violence began a year or two after the relationship began, first with "a push or a shove."

- All three children saw the domestic violence from the time they were babies until the relationship ended with the May 2020 incident.

- Mother could not remember the first time that Father had hit her because he had hit her on many occasions.

- He typically hit her with his open hand.

- He had hit her on the head on a few occasions with his fist and objects, including a two by four.

- Father had knocked her into a wall, had knocked her down at least once, and had caused her to bleed.

- On one occasion, Father beat her at Grandparents' house, and Grandfather intervened.

- Mother had never "really" told anyone about the abuse before she left Father.

- Mother had never sought a protective order because she did not believe "it would do any good"; it would not stop Father from doing what he wanted to do.

- Mother feared Father and would fear for her children's lives if Father pursued custody of them.

- After having children, Mother was incarcerated for two years and later for a year; Father began abusing the children during her first incarceration.

- Father introduced Mother to methamphetamine when she was 21; they both used it.

- Mother also used drugs with Grandma.

- Father had excessively drunk alcohol throughout his relationship with Mother.

- Father had driven drunk.

- Father had forced the children to drive when he was drunk, endangering them.

- Father abused Mother more when he was using drugs or alcohol.

- Father had never seemed to care about anyone but himself.

- Mother did not believe that Father had changed since the children's removal.

- Mother believed that returning the children to Father would endanger them.

The caseworker testified:

- The children feared Father.

- All the children had observed and had experienced domestic violence their whole lives.

- The children had told her about Father's hitting them excessively and in anger.

- David and Kayla told her that Father had paddled one of the children with a board with a nail sticking out of it.

- Lori told her about Father's repeatedly dislocating her shoulder.

- The children told her about Father and Grandma's exposing them to marijuana and allowing them to smoke it and about Grandma's giving them candy infused with alcohol.

The three children all discussed Father's abuse of them and Mother in their conferences with the trial court. The girls remembered Father's knocking Mother to the floor with a lamp, causing her to bleed; paddling them with a board that had a nail sticking out of it; and dislocating Lori's shoulder. David told the trial court that

13

Father had once picked him up and slammed him to the ground and that Father had hit Mother and all the children.

Father denied hitting or physically injuring Mother but admitted that they had engaged in "physical altercations." Father also denied that he had ever been violent with the children. He admitted that he had spanked them "[m]aybe five times ever total in their life" with his hand, a paddle, and a belt, but he denied that the paddle had a nail in it. Other than spanking them, he denied ever hitting, slapping, shoving, or grabbing the children. He testified that it was his son who dislocated Lori's shoulder when she was three years old.

Father testified that the children had never been afraid of him and that he had never heard that they were until he read the transcript of their conferences with the trial court. He also denied that Grandma had ever behaved inappropriately around the children.

## II. DISCUSSSION

In his sole issue, Father challenges the legal and factual sufficiency of the evidence supporting the best-interest finding against him. Because the evidence sufficiently supports that finding, we overrule his issue.

### A. STANDARDS OF REVIEW

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that

14

termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). In resolving the legal-sufficiency issue in this case, we look at all the evidence in the light most favorable to the best-interest finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true.

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the challenged grounds. In this case, we review the entire record to resolve whether the Department proved that termination of the parent-child relationship between Father and the children would be in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Because factually sufficient evidence is necessarily legally sufficient, *Citizens Nat'l Bank v. Allen Rae Invests., Inc.*, 142 S.W.3d 459, 485 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh'g), we perform a consolidated sufficiency review. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

### B. LAW ON BEST INTERESTS

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development,

16

*In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a predicate ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)   the [child's] desires . . . ;

(B)   the [child's] emotional and physical needs[,] . . . now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)   the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)   any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384

17

S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. ANALYSIS

Father contends that the Department failed to prove by clear and convincing evidence that termination of his parental rights was in the children's best interests because Mother voluntarily relinquished her parental rights with the understanding that Grandparents would seek permanent custody; the Department focused on proving the predicate grounds against Father; and other than evidence that "the [c]hildren are in a better environment, doing better, etc. at [Grandparents'] home," the remaining evidence presented was cursory. Although we agree with Father that the trial was short, the evidence sufficiently supports the trial court's best-interest finding.

### 1. Present and Future Emotional and Physical Dangers to the Children and Father's Improper, Inexcusable Conduct

The testimony of Mother and the caseworker and the children's in-camera conferences all support the trial court's implicit finding that a relationship with Father would endanger the children in the present and in the future because of his chronic violence and substance abuse.

18

In addition to showing his chronic substance abuse and violent character, the evidence revealed that Father chose to engage in dangerous conduct affecting the children even after the Department's 2020 involvement with the family began. He chose to drive while intoxicated while two of his daughters were in the car. He failed to take several drug tests, triggering presumed positive results. In the visits that he chose to attend, he behaved in ways that damaged the children's emotional health, so much so that the trial court issued the no-contact order that remained in effect more than a year later. Based on the conflicting evidence, the trial court could have found that Father had violated that order by driving by Grandparents' home, going to Lori's school, and approaching the children in Walmart and that he scared the children when he did so. Thus, even though Father completed BIPP, parenting classes, and other services and took some drug tests, the trial court could have properly inferred from Father's past inexcusable behavior that he would continue to have problems with violence and substance abuse and would continue to endanger the children unless the parent–child relationship was severed. *See In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at *13 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.); *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 226 (Tex. App.—Waco 2015, pets. denied). These factors weigh in favor of termination.

19

## 2. The Children's Desires

The trial court could have properly found that the children wanted nothing to do with Father. When the trial court spoke to the children in chambers, all three told the court that they wanted to live with Grandparents. Lori told the trial court that she did not want to live with Father. Kayla wanted to live with Grandparents and also wanted to change her last name—which was Father's—to that of her Grandparents. David specifically told the trial court that he did not want to live with Father.

The caseworker affirmed that the children were old enough at trial to have their own opinions of Father. She testified that the children did not want to see Father, to live with him, or to have anything to do with him and that they were mad at him and scared of him. The children told the caseworker that they wanted to change their last names to match Grandparents' last name because "[t]hey d[id not] want to be associated with [Father]." The caseworker opined that the children believed that termination of Father's parental rights would serve their best interests.

Mother's testimony echoed the caseworker's. She testified that the children were happy with Grandparents, did not want to return to Father, were afraid of him, and wanted their last name to be the same as Grandparents' last name.

The guardian ad litem's report used the strongest language: "The children do not want to have any contact with their father in any way, shape[,] or form. They've stated that for the last year on multiple occasions. And they've not been coached to say that."

Father testified that he "want[ed] [his] children more than anything" and "would like very much to be able to hug [them], hold [them], [and] tell them how much [he] love[s] them and miss[es] them"; that he did not "want to be out of [their] li[ves;] and that [t]hey[ were] the best thing that [had] ever happened to [him]."

Given the children's ages, their maturity levels (as demonstrated in the transcript of their conferences with court), and the trial court's oral credibility findings, this factor weighs in favor of termination. *See In re E.S.D.L.S.*, No. 02-13-00028-CV, 2013 WL 2339546, at *7 (Tex. App.—Fort Worth May 30, 2013, no pet.) (mem. op.) (relying in part on thirteen-year-old's desire not to return home as a basis for terminating parental rights); *cf. In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pets. denied) (relying on sixteen-year-old's expressed desires to have her mother and to not be adopted as a basis for denying termination).

### 3. The Children's Emotional and Physical Needs and the Parental Abilities of Father and Grandparents

The caseworker testified that the children had been traumatized by their upbringing. The evidence showed that the children had challenges because of the trauma they had endured and needed caregivers who could understand and help them meet those challenges.

All three children were receiving therapy to deal with the domestic violence that had dominated their childhood and the fear it had generated. The caseworker

21

testified that Grandparents understood the children's struggles and had patiently supported and worked with the children in overcoming those struggles. Lori told the trial court that Grandparents were strict, but she wanted to live with them. Kayla told the trial court that Grandparents did not "yell or scream" or "whip" or "abuse" the children. Mother did not believe that Father would ever prioritize the children's emotional well-being or get them counseling.

The caseworker testified that the children's behavior improved after they moved in with Grandparents, who strictly monitored the children's behavior. David was very aggressive toward his sisters and would talk back a lot at the beginning of his placement with Grandparents. By the time of trial, he was very respectful and had learned to control his emotions and be supportive of his sisters. Kayla was very shy with low self-esteem at the removal. By trial, she had become more open and communicative. Lori was very smart, reading three or four levels higher than her grade level, and the trial court could have properly inferred that she needed an environment that stimulated her desire to learn.

Before the placement with Grandparents, the children missed a lot of school, were behind in their schoolwork, and were failing. Mother admitted that she and Father had neglected the children's education. She specifically testified that when Father had physical custody of David during the pandemic, David was "failing everything" because Father did not ensure that his son completed his schoolwork at

home. Father also admitted that the children did not do well in school when they were in their parents' care.

The caseworker testified that after the children's placement in Grandparents' home, Grandparents played a significant role in the children's schooling. With Grandparents, the children made mostly *A*s and attended school every day. They were also involved in school. David joined FFA and played sports. He had not been involved in extracurricular activities before. Mother testified that Grandparents had helped David by providing tutoring and that his grades had improved. Mother believed that returning the children to Father would cause a regression in their education.

Father admitted that he and Mother "could have done a better job" when the children were in their care. The caseworker had concerns about Father's parenting abilities despite his recent completion of parenting classes and BIPP. For her, Father's actions in driving drunk and driving through an intersection marked with a stop sign despite his passenger's warning him about the stop sign demonstrated that he had no concerns about his own safety and welfare and therefore gave her concerns about his being responsible enough to actively parent. The caseworker testified that Father had never contacted her about medical, psychological, or education decisions regarding the children since the removal. The caseworker was also concerned about Father's reliance on Grandma, who had exposed the children

to drugs and alcohol. The caseworker believed that his continued reliance on Grandma would endanger the children.

Father concedes in his brief that the Department presented evidence "that the [c]hildren are in a better environment, doing better, etc. at . . . [G]randparents' home." These factors weigh in favor of termination.

### 4. Plans for the Children and Stability of the Home or Proposed Placement

The Department planned for Grandparents to adopt the children, and Grandparents had the appropriate licensing. Father planned to raise the children himself.

Father did not have a home ready for the children on the day of trial. The house the caseworker thought Father would be in—a small trailer on Grandma's property—was too small for the children and him. The caseworker saw only one bed.

Father testified that he was not going to live in the trailer but had begun moving into Grandma's house; Grandma was going to live in the trailer at a different location. The house had two bedrooms, and he planned to build another room. The caseworker denied that Father had told her about the move to the house, and she had not seen the inside of that house or evaluated any other persons living there. She therefore could not conclude that the house was safe for the children.

The caseworker testified that Father had not shown any sign that he could provide the children with a safe and stable environment; Grandparents, on the other hand, provided the children with a safe and stable environment:

24

The kids have had a stable placement. A safe placement. They have done well in all areas. They've improved schoolwise, hygienewise[, and] in their social—all areas that you can think of they have improved. They have had stability. . . . They have a cooked meal every day now. There were times when they didn't have clean clothes. . . . [G]randmother makes sure that they have clean clothes and are well groomed every day. They feel safe with [Grandparents]. They have their own bed, whereas before they did not. They have their own space.

Mother testified that the children were happy and "well taken care of" by Grandparents and had "improved so much." Kayla recognized that Grandparents provided "a more stable environment." Father even admitted that the children had a "rocky," unstable environment when they lived with their parents but had a safe, stable environment with Grandparents.

These factors weigh in favor of termination.

## D. RESOLUTION

Father appears to concede in his brief that he was not ready to be a full-time parent to the children at trial, but he contends that fact alone is not sufficient to support the best-interest finding. As our analysis shows, the trial court's best-interest finding rests on much more than Father's lack of present ability to parent full-time. The finding and our sustaining of it rest largely on the evidence of Father's persistent family violence—which he denied—and the children's clear desires to be free of him—expressed to the trial court, the caseworker, the guardian ad litem, and Mother. The cases Father relies on are inapposite. *See In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *In re J.G.S.*, 574 S.W.3d 101, 123 (Tex.

25

App.—Houston [1st Dist.] 2019, pet. denied); *In re R.S.*, No. 02-18-00127-CV, 2018 WL 4183117, at *16 (Tex. App.—Fort Worth Aug. 31, 2018, no pet.) (mem. op.); *In re B.C.S.*, 479 S.W.3d 918, 928 (Tex. App.—El Paso 2015, no pet.); *In re N.L.D.*, 412 S.W.3d 810, 819 (Tex. App.—Texarkana 2013, no pet.).

Father emphasizes the constitutional protections of his relationship with the children. However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *E.C.R.*, 402 S.W.3d at 240 (quoting *C.H.*, 89 S.W.3d at 26). Having reviewed all the evidence according to the proper standards of review, *see Z.N.*, 602 S.W.3d at 545 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding against Father. We overrule his sole issue.

## III.  CONCLUSION

Having overruled Father's sole issue, we affirm the trial court's judgment terminating his parental rights.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  May 11, 2023

26